TEXTRON FINANCIAL CORPORATION, Appellee and Cross–Appellant,

v.

NATIONWIDE MUTUAL INSURANCE COMPANY, Appellant and Cross–Appellee.

[Cite as *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.* (1996), 115 Ohio App.3d 137.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 17381.

Decided Oct. 30, 1996.

138

140

*Guy, Lammert & Towne* and *Rachel E. Nader*, for appellee, Textron Financial Corporation.

*Buckingham, Doolittle & Burroughs, Patrick J. Keating* and *Paul W. Allison*, for appellee, United Computer Capital Corporation.

*Brouse & McDowell, Mary K. Whitmer, John C. Fickes* and *Christopher F. Swing*, for appellant, Nationwide Mutual Insurance Company.

REECE, Judge.

Appellant and cross-appellee, Nationwide Mutual Insurance Company, appeals from the jury verdicts rendered against it in the court of common pleas. Appellee and cross-appellant, Textron Financial Corporation, appeals various issues concerning punitive and liquidated damages, attorney fees and prejudgment interest. We reverse.

I

In 1987 Nationwide Mutual Insurance Company entered into a master lease agreement with Continental Information Systems Corporation. The agreement provided Nationwide would lease an IBM 3090–200E computer and accompanying equipment from CIS for $99,000 per month for a term of forty-eight months. The lease was to terminate on August 31, 1991. At the time of execution of the lease, the equipment was valued at approximately $4,687,213.

On November 13, 1987, CIS assigned its interest in the master lease to Textron Financial Corporation. Nationwide consented to the assignment on November 3, 1987. Thereafter, Nationwide made its monthly payments to Textron. On July 5, 1990, prior to the expiration of the master lease, Nationwide entered into a sublease agreement with United Computer Capital Corporation. The sublease term, beginning July 1, 1990, was to run for fourteen months with monthly payments of $41,500. On July 11, 1990, United executed a lease agreement whereby it subleased the IBM computer to Data Hardware, Inc.

Nationwide continued to make monthly payments to Textron as required by the original master lease. On August 28, 1991, three days prior to the expiration of the master lease and after Nationwide tendered its final payment, Textron notified Nationwide that it was terminating the lease due to Nationwide's breach of the provisions of the master lease governing subleasing and the relocation of leased equipment. Nationwide notified United on August 29, 1991 that United would be required to have the subleased computer equipment certified by IBM and returned to Textron due to United's breach of the master, and secondary, leases by subleasing to Data Hardware without prior written consent. At Textron's request, the IBM 3090–200E was shipped to C.E. Services in Texas. The IBM computer arrived in Texas on September 4, 1991. The computer was IBM certified on September 6, 1991 and on September 30, 1991 Textron sold the computer to Data Hardware for $387,000.

On January 10, 1992, Textron filed a complaint against Nationwide in the Summit County Court of Common Pleas alleging breach of contract and unjust enrichment. On February 7, 1992, Nationwide filed a third-party complaint against United for indemnification. Textron amended its complaint on August 31, 1992, adding fraud and negligent misrepresentation to its claims against Nationwide. On May 28, 1993, the trial court granted summary judgment in Nationwide's favor as to Textron's claim for punitive damages. On that same date, the trial court also granted summary judgment in United's favor on the third-party complaint. This court reversed the trial court's judgment in United's favor, holding that the "trial court erred in concluding as a matter of law that UCCC [United] effectively cured its failure to procure consent before subleasing the computer to Data Hardware." *Nationwide Mut. Ins. Co. v. United Comput-*

*er Capital Corp.* (Mar. 16, 1994), Summit App. No. 16340, unreported, at 8, 1994 WL 78640.

Trial in this case began on November 14, 1994. On December 7, 1994, the jury returned verdicts in Textron's favor on its claims against Nationwide for breach of contract, fraud and negligent misrepresentation, and awarded Textron attorney fees. The jury also found in United's favor on Nationwide's third-party complaint. Nationwide moved for judgment notwithstanding the verdict on December 21, 1994. On May 8, 1995, the trial court heard the matter of attorney fees. On July 7, 1995, the trial court granted Nationwide's motion as to attorney fees, finding the jury's award of attorney fees void as against public policy. However, the trial court denied Nationwide's motion as to the jury verdicts in favor of Textron and United.

Textron moved the court for an award of prejudgment interest on July 20, 1995. Thereafter, Nationwide appealed and Textron cross-appealed. The trial court denied Textron's motion for prejudgment interest on October 6, 1995, finding that it lacked jurisdiction over the matter because the instant appeal was then pending in this court. Textron filed an amended notice of cross-appeal from the trial court's October 6, 1995 order on October 26, 1995.

## II

Nationwide offers five assignments of error for our review, and Textron offers four. Based upon our disposition of Nationwide's first, second and third assignments of error, it will be unnecessary for us to discuss the other six assignments of error presented. See App.R. 12(A)(1)(c).

## A

"The trial court erred in overruling the motions for summary judgment, directed verdict and for judgment notwithstanding the verdict by Nationwide Mutual Insurance Company on the claim against it by Textron Financial Corporation for breach of contract."

Textron claims that Nationwide committed six acts in breach of the master lease agreement: (1) Nationwide did not maintain an IBM maintenance contract for the term of the master lease as required by Section 7 of the master lease; (2) Nationwide altered the leased equipment in 1989 by installing an IBM 4128 feature without Textron's consent in violation of Section 8 of the master lease; (3) Nationwide entered into the sublease with United prior to obtaining Textron's consent in violation of Section 11 of the master lease; (4) Nationwide leased to a "non-end user" contrary to Textron's wishes; (5) Nationwide permitted United to enter into a second sublease without Textron's written consent in violation of

Section 11 of the master lease; and (6) Nationwide shipped the computer equipment to Data Hardware in Minnesota in violation of Section 6 of the master lease. While Nationwide is technically guilty of four of the above contract violations, we hold that Textron failed to prove damages as a result of Nationwide's conduct.[1]

"Generally, a breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the nonbreaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and *the nonbreaching party suffered damages as a result of the breach.*" (Citations omitted; emphasis added.) *Garofalo v. Chicago Title Ins. Co.* (1995), 104 Ohio App.3d 95, 108, 661 N.E.2d 218, 226. A claimant seeking to recover for breach of contract must show damage as a result of the breach. *Metro. Life Ins. Co. v. Triskett Illinois, Inc.* (1994), 97 Ohio App.3d 228, 235, 646 N.E.2d 528, 532; *Logsdon v. Ohio N. Univ.* (1990), 68 Ohio App.3d 190, 195, 587 N.E.2d 942, 946. Damages are not awarded for a mere breach of contract; the amount of damages awarded must correspond to injuries resulting from the breach.

"As a general rule, an injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty, and generally, courts have required greater certainty in the proof of damages for breach of contract than in tort." *Rhodes v. Rhodes Indus., Inc.* (1991), 71 Ohio App.3d 797, 808–809, 595 N.E.2d 441, 448. The damages awarded for a breach of contract should place the injured party in as good a position as it would have been in but for the breach. Such compensatory damages, often termed "expectation damages," are limited to actual loss, which loss must be established with reasonable certainty. *Doner v. Snapp* (1994), 98 Ohio App.3d 597, 601, 649 N.E.2d 42, 44.

In the present case, Textron failed to present any evidence of actual loss as a result of Nationwide's breach. Textron received forty-eight payments of

---

1. It is uncontroverted that Nationwide canceled the IBM maintenance contract on the leased 200E computer and that it installed the IBM 4128 upgrade without consent. Additionally, whether or not Nationwide knew of the second sublease to Data Hardware, the second sublease and the transfer of the computer to Minnesota were executed without Textron's written consent, for which Nationwide, as lessee, is responsible.

However, the master lease agreement contained no "end-user" requirement. That "requirement" was merely an oral expression of Textron's wishes. Failure to obtain an "end-user" was not a breach of contract. Furthermore, the sublease to United was not entered into in breach of the master lease. While Nationwide engaged in negotiations and executed a letter of intent to enter into an agreement with United prior to obtaining Textron's consent to the sublease, the sublease agreement was not formally executed until after Textron gave its consent.

$99,000 each, as required by the master lease. Nationwide continued making its monthly payments after the computer was subleased to United; Nationwide did not fail to make a payment. Additionally, Textron's computer was returned at the end of the lease term certified for an IBM maintenance contract, as required under the lease agreement. According to Karen Gustafson, an employee of Data Hardware, Textron's computer upon return "was a complete 200E exactly the way it came in, recertified again by IBM."

Textron argues that the actual damages it sustained should be calculated as equal to the value of the computer at the time of breach, *i.e.*, July 1990. Although Textron did present evidence that the computer's value as of July 1990 was $2,250,000, Textron did not establish a causative link between this value and Nationwide's breach. Whereas the computer was valued at approximately $2.2 million in July 1990, at that time there was only approximately $1.3 million in payments remaining on the lease. Textron received that entire amount. We fail to see *any* correlation between the July 1990 value of the computer and Nationwide's breach of the lease agreement. Textron presented no evidence that the computer's value was diminished by the sublease to Data Hardware; there was no evidence showing that the 200E returned to Textron at the end of the four-year lease was of a lesser value than other 200Es then on the market.

In short, upon return of the computer to Textron, Textron was in a position no different than if Nationwide had kept the 200E the entire lease period and then returned it at the end of the master lease. Textron was in the same position after the breach as it would have been had the contract been fully performed; it received the full benefit of its bargain.

However, Textron further argues that Nationwide's breach caused it to lose business opportunities and impaired "its ability to realize the profits entitled to it under the master lease." Textron contends that it expected Nationwide, or any other "end-user" to which the computer was subleased, to seek upgrades and renewals from Textron, thereby enabling Textron "to realize additional economic value [beyond the monthly payments] under the Master Lease." In support of this contention, Textron offered the testimony of William Miller, a Textron employee. Miller testified that Textron *expected* to receive, in addition to the lease payments provided for in the master lease, additional revenue opportunities relating to upgrades, renewals, extensions and/or additional equipment financing. Such additional financing opportunities were not expressly provided for in the master lease.

Thomas Martin, President since 1969 of CFI Financial Services, a computer leasing company, also testified regarding Textron's lost profits. Martin testified that in the computer leasing industry a lessor can reasonably expect that the lessee will require upgrades and/or a lease renewal in ninety to ninety-five

percent of typical computer lease situations. Martin did not connect these expectations to any monetary figures.

These additional profits Textron expected to receive were not specifically required by the lease agreement. Textron insists, however, that the lease provisions requiring the lessor's consent to upgrade or sublease the computer obligated Nationwide, or any sublessee, to provide Textron with additional profit opportunities. Inherent in this argument is the inference that Textron would arbitrarily withhold its consent to any upgrade, renewal, extension or additional equipment financing not obtained through Textron. Nevertheless, the master lease agreement provides that the lessor may not unreasonably withhold consent to upgrade or sublease. Thus, we cannot automatically assume that any upgrades, renewals, extensions or additional equipment which an "end-user" might have needed would have been financed through Textron.

To successfully assert a claim for lost profits, a plaintiff must demonstrate that the profits were within the contemplation of the parties at the time of execution, that the loss of profits is the reasonable result of the breach, and that the profits are not remote and speculative. *Doner,* 98 Ohio App.3d at 601, 649 N.E.2d at 44. See, also, *Rhodes,* 71 Ohio App.3d at 809, 595 N.E.2d at 448. "There must be more than a conclusory statement as to the amount of lost profits. An explanation of how that sum was determined is required. Lost profits must be substantiated by calculations based on facts available or in evidence, otherwise they are speculative and uncertain." (Citations omitted.) *Id.* The only figure Textron linked to missed opportunities for further financing was the amount Nationwide paid for the 4128 upgrade. However, Textron presented no evidence that it could have reasonably withheld consent for the upgrade if obtained through a company other than Textron. Similarly, Textron made no attempt to calculate the value of any other claimed lost profits.

While Textron presented Martin's testimony that a lessor can reasonably expect additional profits by way of upgrades, renewals and the like, it did not present any specific evidence, other than the 4128 upgrade already discussed, of lost profits which could be substantiated with any certainty by mathematic calculations. Textron presented mere speculation as to lost profits.

Finally, Textron argues that its damages should be calculated according to the stipulated loss provision in the master lease agreement.[2] Section 16 of the master lease, entitled "Remedies," provides:

---

2. We note that the validity of a liquidated damage clause depends upon whether the clause operates as a penalty or as a fair assessment of damages. Where parties have agreed on the amount of damages and expressed the amount in clear and unambiguous terms, that amount will be treated as liquidated damages if, in addition to other factors, the damages are

"If any Event of Default shall occur, Lessor, at its *option,* may (a) proceed by appropriate court action(s) to enforce this Lease or to recover damages for the breach thereof; *or* (b) by notice in writing to Lessee *terminate* this Lease, but Lessee shall remain liable as hereinafter provided; and thereupon Lessor may require Lessee to return the Equipment pursuant to Section 9.B or Lessor may, without notice, liability, or legal process, enter upon the premises where any of the Equipment may be and take possession thereof and thenceforth hold the same free from any right of Lessee, its successors, or assigns; but Lessor shall, nevertheless, have a right to recover from Lessee (whether or not Lessor takes possession of the Equipment) all amounts which under this Lease may be then due or have accrued to the date of such *termination* and also to recover forthwith from Lessee (i) as damages for loss of the bargain and not as a penalty, a sum, with respect to each Item, equal to the Stipulated· Loss Value of such Item * * *." (Emphasis added.)

Contract provisions which are unambiguous must be construed according to their plain, express terms. *USS Great Lakes Fleet, Inc.,* 85 Ohio App.3d at 741, 621 N.E.2d at 464. The above provision is clear; the lessor may elect to proceed by court action to enforce the lease and recover damages *or* the lessor may terminate the lease and recover damages pursuant to the stipulated loss values contained therein. Textron presented evidence that it did not become aware of the sublease to Data Hardware until approximately May 1991. Rather than immediately terminating the lease and proceeding under subsection (b) of the "Remedies" clause, Textron chose to continue accepting lease payments and proceed under subsection (a). Therefore, Textron cannot use the stipulated loss values contained in the master lease as a measure of damages. See, *e.g., Quinn v. Cardinal Foods, Inc.* (1984), 20 Ohio App.3d 194, 20 OBR 239, 485 N.E.2d 741.

Nationwide claims that the trial court erred in overruling its motions for directed verdict and judgment notwithstanding the verdict on Textron's breach of contract claim. The same test is applied when reviewing both motions. *Howell v. Dayton Power & Light Co.* (1995), 102 Ohio App.3d 6, 13, 656 N.E.2d 957, 961. Pursuant to Civ.R. 50(A)(4), the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, must find that the evidence submitted upon any determinative issue could lead reasonable minds to but one conclusion, which is adverse to the nonmoving party, in order to sustain the motion and direct a verdict for the moving party.

---

uncertain as to amount and difficult to prove. *Lake Ridge Acad. v. Carney* (1993), 66 Ohio St.3d 376, 382, 613 N.E.2d 183, 188; *USS Great Lakes Fleet, Inc. v. Spitzer Great Lakes Ltd.* (1993), 85 Ohio App.3d 737, 740, 621 N.E.2d 461, 463. Textron argues that the liquidated damages clause applies in the present case while in the same breath arguing that it has proved actual damages with reasonable certainty.

"A motion for a directed verdict tests the legal sufficiency of the evidence, and therefore presents a question of law, even though in deciding such a motion it is necessary to review and consider the evidence." *Howell, supra,* at 13, 656 N.E.2d at 961. Therefore, this court must make an independent review and, construing the evidence in a light most favorable to Textron, determine whether there is substantial competent evidence favoring Textron so that reasonable minds might reach different conclusions. See *id.* As discussed above, we hold that Textron did not offer, as a matter of law, sufficient evidence of damages as a result of Nationwide's breach of the master lease agreement. Reasonable minds could only conclude, upon the evidence presented, that Textron failed to prove damages.

A judgment may not be entered upon a contract unless all necessary elements have been established. See *Walsh v. Hansco, Inc.* (1971), 31 Ohio App.2d 149, 60 O.O.2d 240, 287 N.E.2d 105. Because Textron did not establish damages at trial, the court erred in overruling Nationwide's motions for directed verdict and judgment notwithstanding the verdict on Textron's claim of breach of contract.

Nationwide's first assignment of error is sustained.

B

"The trial court erred in overruling the motions for summary judgment, directed verdict and for judgment notwithstanding the verdict by Nationwide Mutual Insurance Company on the claims against it by Textron Financial Corporation, by permitting Textron a multiple recovery on claims for breach of contract and tort where the causes of action are factually intertwined."

"The trial court erred in overruling the motions for summary judgment and directed verdict by Nationwide Mutual Insurance Company on the claims against it by Textron Financial Corporation for fraud and negligent misrepresentation."

A party cannot recover under theories of both fraud and negligence based upon the same course of conduct. See, *e.g., Tighe v. Diamond* (1948), 149 Ohio St. 520, 525, 37 O.O. 243, 245, 80 N.E.2d 122, 126. In *Tighe* the Supreme Court, affirming a case arising out of the Ninth District, stated the following:

"As long as the element of inadvertence remains in conduct it is not wilful. Negligence and wilfulness are mutually exclusive terms, implying radically different mental states. Negligence implies a failure to comply with an indefinite rule of conduct in the circumstances of any particular case. It does not involve intent or a conscious purpose to do a wrongful act or to omit the performance of a duty. Intent, purpose or design need not be proven." (Citations omitted.) *Id.* at 525–526, 37 O.O. at 246, 80 N.E.2d at 126. See, also, *Payne v. Vance* (1921), 103 Ohio St. 59, 73–74, 133 N.E. 85, 89.

In the present case, Textron bases its claims for fraud and negligent misrepresentation upon Nationwide's conduct in (1) failing to disclose that United was not an "end-user" and (2) failing to disclose that the computer was further subleased to Data Hardware. These actions by Nationwide were one continuous course of conduct the result of which, Textron claims, caused it to lose the profit opportunities expected from leasing to an "end-user."

 The tort of fraud contains an element of intent, either actual or inferred. See, *e.g.*, *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus. Negligent misrepresentation, in contrast, is evidenced by the failure to exercise reasonable care. See *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 837. While a plaintiff may allege, in the alternative, both fraud and negligent misrepresentation as to the same course of conduct, a defendant cannot be found to have committed an act both intentionally and negligently. As to Nationwide's conduct in the business transaction at issue, it could be either intentional or negligent, but it could not be both. Where fraud and negligent misrepresentation are claimed as to the same set of underlying facts, if fraud is proved, then the claim of negligent misrepresentation is necessarily subsumed thereby.

Textron contends that it established four separate and distinct instances of fraud or negligent misrepresentation. Textron further contends that because Nationwide did not submit an interrogatory to the jury questioning which acts constituted fraud and which did not, it is impossible to determine whether the jury improperly found Nationwide committed both fraud and negligent misrepresentation as to the same acts. We will therefore analyze each act under both theories of recovery.

 First, Textron claims that it established misconduct in Nationwide's failure to disclose United was not an end-user. Nationwide's failure to disclose United's identity as a "non-end-user" is, if tortious at all, fraudulent. A claim of negligent misrepresentation lies against a party "who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, *supplies false information* for the guidance of others in their business transactions * * * if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Emphasis added.) *Delman*, 41 Ohio St.3d at 4, 534 N.E.2d at 838. Negligent misrepresentation does not lie for omissions; there must be some affirmative false statement. *McElroy v. Boise Cascade Corp.* (Tenn.App.1982), 632 S.W.2d 127, 132–133, Textron presented no evidence that Nationwide affirmatively represented United was an end-user. Thus, liability for Nationwide's omission lies, if at all, in fraud.

"[A]n action for fraud and deceit is maintainable not only as a result of affirmative misrepresentations, but also for negative ones, such as the failure of a party to a transaction to fully disclose facts of a material nature where there exists a duty to speak." *Starinki v. Pace* (1987), 41 Ohio App.3d 200, 203, 535 N.E.2d 328, 331. The duty to speak will not necessarily depend on the existence of a fiduciary relationship. "It may arise in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence." *Id.*, quoting *Cent. States Stamping Co. v. Terminal Equip. Co.* (C.A.6, 1984), 727 F.2d 1405, 1409. " '[A] party is under a duty to speak, and therefore liable for non-disclosure, if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another pary [*sic* ] to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a *prior statement or representation* untrue or misleading.' " (Emphasis added.) *Id.* at 1408, quoting *Miles v. Perpetual S. & L. Co.* (1979), 58 Ohio St.2d 97, 100, 12 O.O.3d 108, 110, 388 N.E.2d 1367, 1369.

Textron failed to present evidence supporting a duty on Nationwide's part to reveal that United was not an "end-user." The only evidence Textron presented as to Nationwide's duty to disclose was testimony that a Textron employee communicated to a Nationwide employee that Textron wanted the computer subleased to an end-user and Nationwide understood Textron's wish. Textron presented no evidence that Nationwide represented that it would find an end-user for the computer. Likewise, Textron presented no evidence of a fiduciary relationship or a relationship wherein Textron placed a special confidence in Nationwide because of Nationwide's position. Both parties to the transaction were sophisticated companies with in-house legal departments; Textron and Nationwide were, as business entities, equals dealing at arm's length. Textron presented no evidence supporting a duty on Nationwide's part to disclose United's non-end-user identity.

Additionally, as discussed in Section I of this opinion, Textron failed to establish damages resulting from the lost business opportunities it suffered due to Nationwide's failure to sublease the 200E to an end-user. Proof of damages is an element essential to claims of both fraud and negligent misrepresentation. See *Burr,* 23 Ohio St.3d at 73, 23 OBR at 203, 491 N.E.2d at 1105, and *Delman,* 41 Ohio St.3d at 4, 534 N.E.2d at 837, respectively.

Second, Textron argues that it established Nationwide concealed the 4128 upgrade to the computer. In other words, Nationwide failed to obtain consent for the upgrade as required by the master lease. As Nationwide made no affirmative representation that it did not alter the computer, Textron cannot

make a claim for negligent misrepresentation. Therefore recovery lies, if at all, for fraud.

 Nationwide's failure to obtain Textron's consent to the 4128 upgrade, as fraudulent conduct, cannot be separated from the conduct as breach of the master lease. In Ohio, a breach of contract does not create a tort claim. *Wolfe v. Continental Cas. Co.* (C.A.6, 1981), 647 F.2d 705, 710. Generally, "the existence of a contract action * * * excludes the opportunity to present the same case as a tort claim." *Id.* A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed. *Battista v. Lebanon Trotting Assn.* (C.A.6, 1976), 538 F.2d 111, 117.

 Nationwide's duty to obtain consent for the 4128 upgrade was purely contractual. The additional allegation of an *intentional* failure to obtain Textron's consent to the upgrade by claiming concealment does not change the contractual nature of Textron's claim. See, *e.g., id.* The motive of a breaching party is irrelevant to a contract action. *Wolfe,* 647 F.2d at 710. In claiming fraud, Textron has essentially put Nationwide's motives in failing to obtain consent to the 4128 upgrade at issue. To hold Nationwide liable for fraud based upon actions constituting a breach of contract would be to "abandon the venerable rule that the motive of a breaching party to a contract is irrelevant to the merit of the promisee's claim, and would allow parties to convert contract actions into actions in tort by attacking the motive of the breaching party * * *." *Battista,* 538 F.2d at 118.

 In addition to containing a duty independent of that created by contract, an action arising out of contract which is also based upon tortious conduct must include actual damages attributable to the wrongful acts of the alleged tortfeasor which are *in addition* to those attributable to the breach of the contract. *Cincinnati Gas & Elec. Co. v. Gen. Elec. Co.* (S.D.Ohio 1986), 656 F.Supp. 49, 63. See, also, *Davison Fuel & Dock Co. v. Pickands Mather & Co.* (1977), 54 Ohio App.2d 177, 182, 8 O.O.3d 324, 327, 376 N.E.2d 965, 968; *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgt., Inc.* (1993), 87 Ohio App.3d 613, 629, 622 N.E.2d 1093, 1103 (stating damages recoverable for negligent misrepresentation do not include those derived from the benefit of the plaintiff's contract with the defendant). Review of the record reveals that Textron did not offer evidence of damages distinct from, and in addition to, those it claimed were suffered due to Nationwide's breach of the master lease in failing to obtain consent to the 4128 upgrade.

Next, Textron argues that it established that Nationwide concealed the fact that United had executed a second sublease to Data Hardware. As previously discussed, such omission or "concealment" is actionable, if at all, under a theory of fraud rather than negligent misrepresentation, for which there must be some affirmative misrepresentation.

■ Just as Nationwide's failure to obtain consent to the 4128 upgrade cannot be disconnected, as fraud, from the contractual breach created thereby, its failure to obtain consent to the Data Hardware sublease cannot, as fraud, be separated from the contractual breach. Changing the characterization of the allegation against Nationwide from "failure to obtain consent" to "concealment" of the sublease does not change the ultimate nature of the action as one for breach of contract. Nationwide's duty to obtain consent to any sublease was uniquely contractual. Contending that Nationwide purposely and intentionally failed to obtain consent to the Data Hardware sublease does nothing to alter the contractual character of Textron's claim. See *Battista*, 538 F.2d at 117. Furthermore, Textron did not present evidence of damages, additional to those claimed for breach of contract, proximately resulting from Nationwide's tortious conduct. Textron's argument for damages due to the Data Hardware sublease is essentially that of lost profits suffered from the lack of an end-user. We have previously discussed Textron's failure to show lost profit damages.

Finally, Textron asserts that it established Nationwide concealed the Minnesota location of the 200E computer. As to this instance of tortious conduct, Textron presented evidence of an affirmative representation by Nationwide that the computer was located in Columbus, Ohio just days before it was relocated to Minnesota. Additionally, Textron presented evidence that Nationwide reimbursed Textron for Ohio property taxes on the computer, without comment, although the computer was no longer located in Ohio. Thus, both fraud and negligent misrepresentation may apply.

■ As discussed above, a claim of negligent misrepresentation lies against a party "who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions * * * if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Delman*, 41 Ohio St.3d at 4, 534 N.E.2d at 838. Whether intentionally or not, Nationwide failed to disclose the true location of Textron's 200E computer and, in fact, represented a location which was, if not initially, then ultimately, incorrect. However, the duty to obtain Textron's consent to a change in the computer's location was contractual. Pertaining to the claim of negligent misrepresentation, Textron did not establish a duty additional to that which was contractual. See *Battista*, 538 F.2d at 117. Similarly, Textron did not establish

damages attributable to a negligent misrepresentation of the location of the 200E distinguishable from those it claimed for the same conduct under a breach of contract theory. See *McCarthy, Lebit,* 87 Ohio App.3d at 629, 622 N.E.2d at 1103.

■■ "[A]n action for fraud and deceit is maintainable not only as a result of affirmative misrepresentations, but also for negative ones, such as the failure of a party to a transaction to fully disclose facts of a material nature where there exists a duty to speak." *Starinki,* 41 Ohio App.3d at 203, 535 N.E.2d at 331. " '[A] party is under a duty to speak, and therefore liable for non-disclosure, if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another pary [*sic*] to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a *prior statement or representation* untrue or misleading.' " (Emphasis added.) *Cent. States Stamping Co.,* 727 F.2d at 1408, quoting *Miles v. Perpetual S. & L. Co.,* 58 Ohio St.2d at 100, 12 O.O.3d at 110, 388 N.E.2d at 1369. In the case *sub judice,* Textron presented evidence that Nationwide had represented that the 200E computer was in Columbus, Ohio just days before it was shipped to Minnesota. Nationwide failed to disclose the computer's true location thereafter. Thus, pertaining to its fraud claim, Textron offered evidence of a duty to disclose the location of the computer separate from that created by the master lease. Having made a prior statement which was untrue or misleading, Nationwide was under a duty to disclose the relocation of the 200E.

However, Textron again failed to establish damages separate from those it argued were attributable to Nationwide's breach of the master lease in failing to obtain consent to relocate the 200E computer. A breach of contract does not create a tort claim. *Wolfe,* 647 F.2d at 710. "[T]he existence of a contract action generally excludes the opportunity to present the same case as a tort claim." *Id.* While Textron established a duty to disclose relocation of the computer distinguishable from that created by the master lease, in failing to establish damages additional to those it claimed as a result of contract breach, Textron did not ultimately differentiate its fraud claim from its claim for breach of contract. Such is the case with Textron's tort and breach of contract claims as a whole; the two claims, so factually entwined, are impossible to dissociate. Recovery cannot be had for both.

"A motion for a directed verdict tests the legal sufficiency of the evidence, and therefore presents a question of law, even though in deciding such a motion it is necessary to review and consider the evidence." *Howell,* 102 Ohio App.3d at 13, 656 N.E.2d at 961. Therefore, this court must make an independent review and, construing the evidence in a light most favorable to Textron, determine whether there is substantial competent evidence favoring Textron so that reasonable

minds might reach different conclusions. See *id.* This same standard applies to a motion for judgment notwithstanding the verdict. *Id.* As discussed above, we hold Textron did not offer, as a matter of law, evidence of a duty separate from that created by the master lease agreement as to its claims of fraud relating to the 4128 upgrade and the Data Hardware sublease. Additionally, Textron did not offer evidence of a duty to disclose concerning the end-user requirement. Finally, Textron did not offer evidence of damages in tort additional to those it claimed for breach of contract.

Reasonable minds could only conclude, upon the evidence presented, that Textron failed to prove elements essential to its tort claims. Thus, the trial court erred in failing to grant Nationwide's motions for directed verdict and judgment notwithstanding the verdict on Textron's claims for fraud and negligent misrepresentation.

Nationwide's second and third assignments of error are sustained.

### III

Because Nationwide's first, second and third assignments of error are sustained, it is unnecessary for us to address all other assignments of error, including those contained in Textron's cross-appeal. See App.R. 12(A)(1)(c). The verdicts and damage awards against Nationwide are reversed, and judgment is entered in Nationwide's favor. See App.R. 12(B).

*Judgment reversed.*

QUILLIN, P.J., concurs.

BAIRD, J., concurs in part and dissents in part.

BAIRD, Judge, concurring in part and dissenting in part.

While conceding breaches, the majority denies recovery therefor due to inadequacy of proof of damages flowing therefrom. Since I believe that there was substantial evidence of damages, upon which reasonable minds may reach different conclusions, I cannot agree with the majority's disposition of the breach of contract portion of this case.

Substantial evidence was introduced concerning business opportunities which Textron lost as a result of Nationwide's breaches. All of the voluminous testimony concerning the desirability, from Textron's standpoint, of having the computer in the hands of an end user cannot be dismissed by a simple reference to that part of the contract which required that Textron not unreasonably withhold its consent to later changes. There was ample testimony that the opportunity for future business is a major factor in the negotiation of such lease contracts, and one that is well known in the industry. Indeed, Nationwide's

earlier proposed sublease to Encore was rejected by Textron, and that rejection was apparently unhindered by the contractual provision concerning withholding of consent.

Likewise, there was substantial evidence in the case of economic benefit that was realized by other entities, and thus lost to Textron, that arose out of Nationwide's breaches.

Moreover, it seems to me that portions of the evidence which have been viewed as relating primarily to the tort claims are, in reality, also cognizable as proof of breach of contract damages. In many instances, claimed concealment by Nationwide, heretofore viewed as relating to tort claims, can just as well constitute proof of breach of contract damages. For instance, if Nationwide cannot sublease without approval of Textron, the process of gaining approval would necessitate advising Textron of the sublease. In other words, both proceeding without approval and proceeding without advising are contract breaches, subjecting Nationwide to liability to Textron for the monetary consequences of Textron's not taking certain more favorable actions which might have been available if Textron had known of the breaches.

I believe that the breach of contract portion of the judgment should be affirmed, so I dissent as to the majority's disposition of Nationwide's first assignment of error. I concur in the majority's disposition of Nationwide's second and third assignments of error. Further, I would overrule Nationwide's fourth and fifth assignments of error. As to Textron's appeal, I would sustain the first cross-assignment of error, overrule the second and fourth cross-assignments of error, and remand to the trial court for a decision on the issue of prejudgment interest.