NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0437n.06

Nos. 10-3223/10-3282

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jun 29, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| JAMES R. EGGERT, EGGERT AGENCY INC., MOUNT CARMEL HEALTH SYSTEM, GREGORY R. NICKELL, | ) ) ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiffs-Appellees, Cross-Appellants, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| MERITAIN HEALTH, INC., fka, North American Health Plans, Inc., NA MANAGEMENT CORPORATION, NORTH AMERICAN BENEFITS AGENCY, INC., dba, North American Benefits Network, Inc., | ) ) ) ) ) ) | |
| | ) | |
| Defendants-Appellants, Cross-Appellees. | ) ) | |

BEFORE: COOK, McKEAGUE, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

In this action, plaintiffs Eggert Agency Inc., Mount Carmel Health System, James R. Eggert, and Gregory R. Nickell filed suit against defendants Meritain Health, Inc., NA Management Corp., and North American Benefits Network, Inc., asserting several claims relating to defendants' performance of obligations required under a share purchase agreement. Following a four-day bench trial, the district court found in favor of plaintiffs, awarding significant monetary damages, but declining to award prejudgment interest. Both parties filed timely appeals. Defendants appeal the

issue of damages, only.  Plaintiffs cross-appeal the district court's refusal to award prejudgment interest.  Upon review, we affirm in part, reverse in part, and remand.

I.

In 2003, plaintiffs Eggert Agency, Inc. ("Eggert Agency") and Mount Carmel Health System ("Mount Carmel") sold E-V Benefits Management, Inc. ("E-V"), a central Ohio third-party administrator ("TPA"), to two affiliated corporations, defendants NA Management Corp. and North American Benefits Network, Inc. (collectively "NABN").  At that time, Eggert Agency and Mount Carmel were the only shareholders of E-V, while plaintiffs James R. Eggert and Gregory R. Nickell were E-V executive officers and employees.

NABN's acquisition of E-V was memorialized in a share purchase agreement ("SPA") with a purchase price of $1,135,000.  Twenty percent of this amount, $227,000, was paid immediately upon execution of the SPA.  The remaining eighty percent of the purchase price was to be paid in the form of two seven-year subordinated term notes.  However, the subordinated term notes were subject to an adjustment on the third anniversary of the acquisition's closing.  This adjustment was to be calculated as follows:

> If the average Revenue for the three year period following the Closing (the "Actual Revenue") is less than the Base Revenue Amount, the shortfall shall be multiplied by the Revenue Multiple and then by the Stock Factor and the resulting amount shall be deducted from the principal amount outstanding and reamortized at the same interest rate over the remaining four years.  If the average Revenue for the three year period following the Closing is greater than the Base Revenue Amount, the excess shall be multiplied by the Revenue Multiple and then by the Stock Factor and the resulting amount shall be added to the principal amount outstanding and reamortized over the ensuing four years.  Interest on the adjusted Principal Amount shall accrue from the third anniversary of the Closing.

Put more simply, the payments due during the final four years of the payment period were contingent upon the generation of revenue attributable to E-V during the first three years of the payment period (the "revenue period"). Payments to Eggert and Nickell were similarly dependent upon the revenue generated by E-V during this time, as provided by the E-V Benefits Management Inc. Incentive Growth Plan (the "growth plan"), which was incorporated into the SPA. To ensure that NABN would generate revenue attributable to E-V during the revenue period, the SPA provided certain obligations:

> NABN shall:
>
> a. Introduce established marketing (i.e. broker/consultant) relationships in the Greater Columbus, Greater Toledo and other appropriate areas to the E-V Marketing personnel, as appropriate.
>
> b. Train the E-V Marketing personnel and all other appropriate staff on all of NABN's products and services.
>
> c. Provide marketing materials.
>
> d. Provide marketing support in the form of proposal generation, presentation assistance, etc., by NABN officers, directors or staff.
>
> e. Retain an E-V marketing staff to be designated as the E-V Marketing Resource, reporting to NABN's Executive Vice President, Marketing & Sales.
>
> f. Provide for reasonable commission schedules for sales staff.

These obligations later passed onto defendant Meritain Health, Inc. ("Meritain"), which acquired NABN on December 23, 2004.

Before the execution of the SPA, E-V was a prominent central Ohio TPA, retaining 65 employees and averaging $4,000,000 in annual revenues. However, E-V did not perform well under the direction of defendants. At the end of the revenue period, the revenue generated by E-V was far lower than expected. Indeed, E-V lost the vast majority of its clients, beginning the revenue period with 22 clients, and ending with 2. In addition, E-V did not obtain any new clients during the revenue period. As a result of this poor performance, the adjustment that took place on the third anniversary of the acquisition's closing resulted in significantly reduced payments to plaintiffs.

Alleging that defendants failed to honor their obligations in generating revenue attributable to E-V, plaintiffs filed suit in Ohio state court on September 7, 2007. Defendants thereafter removed the matter to the United States District Court for the Southern District of Ohio based upon diversity jurisdiction. In their complaint, plaintiffs asserted several Ohio-law claims sounding in contract and tort. Following defendants' motion to dismiss and motion for summary judgment, plaintiffs' sole remaining claim for breach of contract proceeded to a four-day bench trial.

On January 22, 2010, the district court entered findings of fact and conclusions of law favorable to plaintiffs. Therein, the district court concluded that defendants had breached the express requirements of the SPA by failing to introduce established marketing relationships to E-V personnel and failing to maintain E-V marketing staff. In addition, the district court found that defendants breached the duty to expend reasonable efforts and the implied covenant of good faith and fair dealing by failing to employ sufficient E-V marketing staff, closing E-V's Columbus office, eliminating the E-V brand, and preventing E-V from obtaining Summit County, Ohio as a client.

The district court then proceeded to address the issue of damages. First, the district court found that, absent defendants' breach of the SPA, E-V would have been able to capitalize on a promising local TPA market "exploding with opportunities." Thereafter, the district court relied upon the expert testimony of Glenn McLellan to determine the monetary value of this lost business. Specifically, the district court found that, absent defendants' breach, E-V was reasonably certain to have closed on 6% of 70 new business opportunities each year, resulting in 4 new clients per year. Multiplying these 4 clients by the average number of covered employees, 375, yielded a total of 1,500 new covered employees per year. With each covered employee generating an average of $20 in revenue per month, the district court held it was reasonably certain that E-V would have generated $30,000 in new business revenue per month, resulting in $360,000 each year. Finding that revenue generated from new clients would carry throughout the revenue period, the added revenue was found to be $360,000 for the first year, $720,000 for the second year, and $1,080,000 for the third year, yielding $2,160,000 for all three years and an average annual increase in revenue of $720,000.

These lost profits were then added to the "base revenue amount," defined by the SPA as $4,298,000. The district court determined, based upon the testimony of Eggert, that the base revenue amount represented the parties' agreement as to the annual revenue E-V would have expected at the time of acquisition, assuming no loss or gain in clients. Also added to the base revenue amount was the value of a contract with Summit County, which the district court found that defendants had prevented E-V from obtaining.

The district court also analyzed the facts and circumstances, unrelated to defendants' breach, which may have caused the loss of former and prospective clients. First, the district court credited the testimony of Todd Squilanti, a Meritain employee, who testified that upon acquisition, businesses generally "forecast a minimum of 15 percent attrition[.]" Accordingly, the court found that 15% of the base revenue amount, $644,700, represented annual losses caused by the acquisition and a required system conversion. In addition, the district court found that the loss of one E-V client, Max & Erma's, was unrelated to defendants' breach. Finally, the district court addressed other possible causes of client attrition, including the loss of a principal sales person and general staff reductions. However, the district court found that such issues did not affect E-V's client retention.

Based upon these calculations, the district court summarized its findings as follows:

> Having considered the parties' agreed expectations regarding baseline revenue, the market opportunities described at trial, and the various challenges faced by E-V, the Court finds that, in the absence of a breach, E-V would have enjoyed an average annual Revenue of $4,514,100 during the Revenue Period. This amount is the sum of the Base Revenue Amount ($4,298,000) and the average annual increase E-V should have enjoyed from existing market opportunities in Columbus ($720,000) and the Summit County opportunity ($376,000), less the annual amounts lost due to factors unrelated to Defendant's breach: the amount lost due to the acquisition and associated rocky system conversion process ($644,700) and the decrease in revenue from the loss of Max & Erma's ($235,200).

The district court then placed its projected annual revenue amount into the adjustment calculation provided by the SPA to determine the proper payments to plaintiffs under the subordinated term notes and the growth plan. However, the district court declined to award prejudgment interest. Both parties filed timely appeals.

- 6 -

II.

On appeal, defendants challenge the district court's findings with regard to damages. Specifically, defendants contend that the district court erred in finding that their breach of the SPA caused E-V lost revenues. In addition, defendants oppose the district court's damages calculation on two grounds: that it was speculative and based on an improper baseline. On cross-appeal, plaintiffs claim that the district court erred in refusing to award prejudgment interest. We address each issue in turn.

III.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, a party may contest the sufficiency of the evidence supporting a district court's findings following a bench trial. *See* Fed. R. Civ. P. 52(a)(5) ("A party may later question the sufficiency of the evidence supporting the findings, whether or not the party requested findings, objected to them, moved to amend them, or moved for partial findings."). This court reviews sufficiency claims de novo, "without determining credibility or weighing evidence, and giving the prevailing party the benefit of all reasonable inferences." *Argentine v. United Steelworkers of Am., AFL-CIO*, 287 F.3d 476, 483 (6th Cir. 2002). The district court should be reversed "only if reasonable minds could not come to a conclusion other than one favoring the movant." *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996). The district court's findings of fact, however, may not be set aside unless clearly erroneous. Fed. R. Civ. P. 52(a)(6). Clear error exists "only when the reviewing court is left with the definite,

firm conviction that a mistake has been made." *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005).

The SPA is governed in all respects by the laws of the state of Ohio. In Ohio, "[a] claimant seeking to recover for breach of contract must show damage as a result of the breach." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1266 (Ohio Ct. App. 1996). "The damages awarded for a breach of contract should place the injured party in as good a position as it would have been in but for the breach. Such compensatory damages, often termed 'expectation damages,' are limited to actual loss, which loss must be established with reasonable certainty." *Id.* (quoting *Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio Ct. App. 1994)). Such expectation damages may include lost profits. However, to recover lost profits, a plaintiff must demonstrate that they are "the reasonable result of the breach, and that the profits are not remote and speculative." *Id.* at 1267. "The determination of the existence and amount of the lost profits is a question of fact." *Kosier v. DeRosa*, 862 N.E.2d 159, 165 (Ohio Ct. App. 2006). Damages, like all other elements of a breach of contract claim, must be proven by a preponderance of the evidence. *Langfan v. Carlton Gardens Co.*, 916 N.E.2d 1079, 1087 (Ohio Ct. App. 2009).

## A. Causation

The district court determined that defendants' breach of the SPA caused E-V to lose former clients, prospective clients, and a contract with Summit County. On appeal, defendants assert that the evidence was insufficient to find that the breach caused any of these losses. Upon review, we hold that the evidence was sufficient to support the district court's findings with regard to E-V's loss

of former and prospective clients, but was insufficient regarding the loss of a contract with Summit County.

### 1. Former and Prospective Clients

In its findings of fact and conclusions of law, the district court determined that defendants breached the SPA by failing to introduce established marketing relationships to E-V personnel, failing to maintain E-V marketing staff, closing E-V's Columbus office, and eliminating the E-V brand. Acknowledging that the existence and amount of damage must be proven with "reasonable certainty," the district court concluded that defendants' "breach caused client attrition and prevented E-V from earning new clients[.]" This finding was reasonable and well-supported.

First, the testimony elicited from numerous lay and expert witnesses indicated that marketing relationships and personnel, local presence, and branding were all significant factors affecting a TPA's success. Moreover, defendants *admitted* that their actions caused the loss of former and prospective E-V clients. For example, Donald Baker, chairman, CEO, CFO, and treasurer of NABN, testified that defendants "killed off" the E-V brand and closed E-V's Columbus office, causing the loss of existing E-V clients. Baker further acknowledged that defendants failed to commit the resources necessary to foster E-V's growth. Accordingly, based upon the testimony elicited at trial and defendants' admissions, the district court's finding that the loss of former and prospective E-V clients was attributable to defendants' breach was supported by sufficient evidence.

Nevertheless, despite the above-referenced testimony, defendants contend that plaintiffs' causation evidence was insufficient because they failed to obtain direct testimony from any former

or prospective E-V client. Without such testimony, defendants assert that E-V's business failures could be attributable to any number of factors unrelated to the breach.[1] This argument misses the mark for two reasons. First, while the testimony of former and prospective E-V clients may have provided helpful information regarding the issue of causation, defendants cite to no Ohio authority, and we find none, requiring plaintiffs to provide such direct evidence to establish causation. Indeed, the Ohio Court of Appeals has sanctioned the use of circumstantial evidence, and the reasonable inferences drawn therefrom, in making causation findings. *See, e.g.*, *Roelle v. Orkin Exterminating Co.*, No. 00AP-14, 2000 WL 1664865, at *8 (Ohio Ct. App. Nov. 7, 2000) (noting that a court could reasonably infer, based upon timing, that a previous termite infestation did not cause the damages at issue); *accord Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 238 F. Supp. 2d 604, 608 (S.D. N.Y. 2002) (noting that evidence was sufficient to establish that breach caused the loss of clients, even without direct client testimony).

Second, in making its findings of fact regarding causation, the district court was in a position to weigh the evidence presented and give determinative credit to the evidence it found persuasive. *See Westinghouse Elec. Corp. v. Dolly Madison Leasing & Furniture Corp.*, 326 N.E.2d 651, 656 (Ohio 1975) ("Defendants suggested that other causes of the fire were possible, such as spontaneous

---

[1]To support this argument, defendants repeatedly cite to *Telxon Corp. v. Smart Media of Delaware, Inc.*, Nos. 22098, 22099, 2005 WL 2292800 (Ohio Ct. App. Sept. 21, 2005). *Telxon* stands for the unremarkable principle that "damages must [be] directly caused by the wrongful breach, not by something else." *Id.* at *37. *Telxon* does not hold that direct evidence is required to prove causation, or that every conceivable cause of loss must be ruled out before causation may be established by a preponderance of the evidence.

combustion, arson, or sparks from a locomotive. However, all these possible causes were questions of fact for the jury[.]"). Plaintiffs were not required to affirmatively disprove all possible causes of E-V's losses outside of breach. Indeed, the Supreme Court of Ohio has noted that such a requirement "would impose a burden of proof analogous to the burden in criminal cases of proof beyond a reasonable doubt." *Id.* Instead, plaintiffs needed only to put forth enough evidence to prove, by a preponderance of the evidence, that defendants' breach caused the loss of former and prospective E-V clients. The district court found that plaintiffs had met their burden, and the evidence was sufficient to support this finding.[2]

## 2. Summit County

In addition to their marketing and branding failures, the district court found that defendants breached the SPA by preventing plaintiffs from pursuing an opportunity with Summit County, causing the loss of a contract valued at $376,000 in annual revenue. Again, while not disputing the underlying breach, defendants assert that the evidence was insufficient to support the district court's finding that their actions caused the loss of a contract with Summit County. We agree.

The only evidence in the record pertaining to the opportunity with Summit County was the direct examination of Eggert. This testimony was accurately summarized by the district court as follows:

---

[2]In holding that 15% of former client losses were attributable to the acquisition and the concomitant system conversion, the district court relied upon and credited the opinion of Todd Squilanti, who testified that a 15% loss in clients is generally expected to occur after an acquisition. Accordingly, defendants' assertion that this percentage is "meaningless" is without merit.

Eggert was a "lifelong friend" of Don Plusquellic, the mayor of Akron, Ohio. (Tr. 387.) Eggert and his wife made a personal trip to Boston to support Mayor Plusquellic when he was installed as the president of the National Conference of Mayors in 2004. (Tr. 387-88 .) In Boston, Mayor Plusquellic introduced Eggert to the Executive Director of Summit County, Ohio[.] (Tr. 388.) Eggert testified that he "spent time on a couple of occasions during the conference speaking with the Executive Director," who gave Eggert his business card and requested that Eggert call him. (Tr. 388.)

When Eggert returned to Ohio, he contacted Ken Jones in Summit County's Risk Management Department, which handled the county's employee benefit plan. (Tr. 389.) They set up a meeting in August of 2004, attended by Eggert, Chuck Bates, Jones, and Mayor Plusquellic. (Tr. 390, 391.) Eggert testified that he found the meeting to be "[v]ery favorable," and a follow-up meeting was arranged between Eggert, Bates, and Jones to further discuss the program. (Tr. 390.)

Eggert "immediately reported to Ron Dewsnup and Cheryl Tidwell the details of the meeting," telling them that "it was a great opportunity," that Mayor Plusquellic "attended and gave a strong reference to us and participated in the meeting and discussions about the program," and that a follow-up meeting had been arranged. (Tr. 390-91.) At Dewsnup's request, Eggert arranged for Tidwell to attend the follow-up meeting along with Eggert and Bates. (Tr. 391.) Just prior to that follow-up meeting, Tidwell, who was arriving from a different direction, met Eggert and Bates at a restaurant and advised them that Eggert and Bates "were to stay out of Summit County." (Tr. 391-92.) She further advised them that Sandy Hahn, a sales representative of NABN, would be pursuing the Summit County opportunity. (Tr. 393.) If Hahn had secured the account, the revenue would not have been attributable to E-V. (Tr. 394.)

Based upon this testimony, the district court found "that Defendant prevented Plaintiffs from taking advantage of the Summit County opportunity, which could have increased Revenue, thereby increasing the amount of monies owed Plaintiffs under the SPA." However, the district court never made an express finding that, absent the breach, E-V was reasonably certain to obtain a contract with Summit County. *See Textron*, 684 N.E.2d at 1266 (holding that damages must be "established with reasonable certainty").

We hold that the evidence was insufficient to find that E-V was reasonably certain to obtain a contract with Summit County in the absence of defendants' breach. McLellan testified that the average TPA only closes on 6 - 12% of the opportunities presented on an annual basis, and the district court credited this testimony, holding that E-V was reasonably certain to close on 6% of presented opportunities. While Eggert believed that the first meeting with Summit County was "very favorable," there was no evidence indicating how likely it was that Summit County would eventually sign a contract with E-V. Indeed, when asked whether E-V was likely to obtain a contract with Summit County, Eggert merely noted that Summit County presented "a great opportunity."

Accordingly, the evidence was insufficient to support the finding that E-V was reasonably certain to have obtained a contract with Summit County in the absence of defendants' breach. Upon remand, the district court must recalculate the amount of E-V's lost profits, excluding those losses attributable to the Summit County contract.

## B. Damages Calculation

In their second claim of error, defendants assert that the district court's calculation of lost profits pertaining to the loss of prospective E-V clients was speculative. This argument is without merit.

"Lost profits must be substantiated by calculations based on facts available or in evidence, otherwise they are speculative and uncertain." *Rhodes v. Rhodes Indus., Inc.*, 595 N.E.2d 441, 448 (Ohio Ct. App. 1991). However, such damages need not be proven with mathematical precision. Rather, the amount of lost profits "may be reasonably estimated." *TJX Cos., Inc. v. Hall*, 916 N.E.2d

862, 869 (Ohio Ct. App. 2009). Accordingly, "[d]amages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." *Id.* (internal quotation marks and citation omitted).

In calculating damages, the district court relied upon the expert opinion of McLellan, who testified regarding the revenues an average TPA would be likely to obtain in central Ohio during the revenue period. This testimony was based upon McLellan's appreciable experience in the TPA field. In addition, McLellan relied in substantial part on his knowledge of the central Ohio TPA market, knowledge obtained through his work with an E-V competitor, Central Benefits Insurance Company, commonly referred to as "CenBen." Because this testimony constitutes "competent, credible evidence," the district court's damages calculation was not speculative. *See Srail v. RJF Int'l Corp.*, 711 N.E.2d 264, 273 (Ohio Ct. App. 1998) ("When reviewing a damages award, an appellate court must not reweigh the evidence and may not disturb an award of damages unless it lacks support from any competent, credible evidence.").

Defendants assert that McLellan's testimony was not credible because he relied upon statistics stemming from CenBen and local TPA averages, rather than statistics specific to E-V. However, it was not unreasonable for McLellan to rely upon numbers obtained from TPAs competing in the relevant market during the revenue period, rather than E-V's prior performance, as the revenue period presented a market "exploding" with new opportunities. Moreover, the

experiences of similar business enterprises[3] is a proper factual basis upon which to calculate lost profits, *Thomasville Furniture Indus., Inc. v. Elder-Beerman Stores Corp.*, 250 B.R. 609, 629 (S.D. Ohio 1998) (applying Ohio law) (citing *AGF v. Great Lakes Heat Treating Co.*, 555 N.E.2d 634, 640 (Ohio 1990)), and "[g]reat liberality is allowed the expert in determining the basis of his opinions[,]" *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 853 (6th Cir. 1981). While defendants had the opportunity to do so, they provided no evidence to contradict McLellan's testimony. Accordingly, the district court's damages award was supported by competent, credible evidence, and was not speculative.[4] *See Srail*, 711 N.E.2d at 273.

## C. Baseline for Damages Calculation

As their final claim of error, defendants assert that the district court selected an improper baseline in calculating damages. During his direct examination, Eggert testified that the base revenue amount represented the parties' agreement as to the revenue E-V "would have expected on an annual basis from the existing business, E-V Benefits going on as a going concern, with no new

---

[3]CenBen and E-V, both headquartered in Columbus, Ohio, were direct competitors in the central Ohio TPA market.

[4]Defendants also assert that the district court "misconstrued" McLellan's testimony regarding the underlying basis for his lost-profits calculations. This assertion is baseless. The district court held that an average TPA had 70-75 opportunities per year, and that each opportunity averaged 375 covered employees. While these statistics stem from CenBen's experience during the revenue period, McLellan testified that they were a reasonable basis upon which to extrapolate what E-V could have achieved in the central Ohio market during the revenue period. Accordingly, the district court did not misconstrue the opinions of McLellan.

business, no loss of clients" as a "straight line going forward[.]"[5]  Crediting this testimony, the

district court used the base revenue amount as a starting point in calculating the revenues that likely

would have been obtained by E-V in the absence of defendants' breach.

Defendants contend that the district court erred as a matter of law in ascribing this meaning

to the base revenue amount, asserting that the clear and unambiguous language of the SPA indicates

that the base revenue amount is nothing but a "fixed standard for calculation purposes only."

However, while defendants are correct that "clear and unambiguous [contracts] require no real

interpretation or construction," *Fouty v. Ohio Dep't of Youth Servs.*, 855 N.E.2d 909, 925 (Ohio Ct.

App. 2006), defendants are incorrect in asserting that the SPA unambiguously supports their

interpretation of the base revenue amount.  Indeed, the SPA simply does not speak to the underlying

*meaning* of the base revenue amount or how it was calculated.  Rather, the SPA merely defines the

term as "Four Million Two Hundred Ninety Eight Thousand Dollars ($4,298,000)."  Because the

SPA does not answer the question, the district court did not err in considering the testimony of

Eggert regarding the significance of the base revenue amount.  *See Allason v. Gailey*, 939 N.E.2d

206, 212 (Ohio Ct. App. 2010) ("If a contract, or term in a contract is reasonably susceptible to more

than one meaning, then it is ambiguous and extrinsic evidence of reasonableness or intent can be

employed.").

---

[5]At the time the SPA was signed, four of E-V's existing clients were listed as "runout," indicating that these clients had a contract with E-V that was not going to be renewed.  However, the base revenue amount did not include projected revenue from these four clients.  Accordingly, defendants' assertion that the district court did not account for runout clients is incorrect.

In addition, defendants contend that the district court's use of the base revenue amount impermissibly shifted the burden of proof to defendants. This argument is unfounded. The district court correctly noted that the burden of proving the existence and amount of damages was on plaintiffs. Using the base revenue amount as a baseline did not alter this legal landscape. Nevertheless, defendants contend that using the base revenue amount as a baseline, rather than E-V's actual revenues, created a presumption that the entire difference between these numbers was attributable to defendants' breach. The district court, however, did not *presume* anything. The district court's chosen calculation reflects its finding that the difference between E-V's actual revenues and the base revenue amount represented losses caused by defendants' breach, with certain listed exceptions. Accordingly, the district court did not err in using the base revenue amount as its baseline.

IV.

On cross-appeal, plaintiffs claim that the district court erred in refusing to award prejudgment interest. To begin, the parties dispute our standard of review. Plaintiffs assert that their entitlement to prejudgment interest is a question of law, to be reviewed de novo, while defendants contend that this court reviews the denial of prejudgment interest for an abuse of discretion. We conclude that under Ohio law, the appropriate standard of review is de novo.

Defendants rely upon *Conte v. General Housewares Corp.*, 215 F.3d 628 (6th Cir. 2000), in asserting that abuse-of-discretion review is proper. In *Conte*, this court noted: "In a diversity case, state law governs the district court's decision whether to award prejudgment interest, . . . which is

reviewed by this court for an abuse of discretion, *see Stallworth v. City of Cleveland*, 893 F.2d 830, 836 (6th Cir. 1990) (applying Ohio law)." *Id.* at 633 (citation omitted). However, *Conte* and *Stallworth* both involved the issue of prejudgment interest awarded pursuant to Ohio Revised Code ("ORC") § 1343.03(C), which pertains to actions in tort. *Conte*, 215 F.3d at 633; *Stallworth*, 893 F.2d at 836. Section 1343.03(C) requires a tort plaintiff to demonstrate his or her good-faith effort to obtain a settlement. *See* ORC § 1343.03(C) (providing that plaintiff must demonstrate that defendant "failed to make a good faith effort to settle the case and that [plaintiff] did not fail to make a good faith effort to settle the case[.]"). This good-faith determination is "within the sound discretion of the trial court" and reviewed for an "abuse [of] discretion[.]" *Worrell v. Multipress, Inc.*, 543 N.E.2d 1277, 1285 (Ohio 1989).

However, Ohio contract law is different. It does not require a good-faith finding to impose prejudgment interest on a contract award; all it requires is a favorable judgment:

> [W]hen money becomes due and payable upon any . . . instrument of writing, . . . the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract.

ORC §1343.03(A). Accordingly, the issue of prejudgment interest in contract is a pure question of law, requiring de novo review. *See Forest Hills Local Sch. Dist. Bd. of Ed. v. Huegel*, Nos. CA2007-02-026, CA2007-02-032, 2008 WL 2102406, at *3 (Ohio Ct. App. May 19, 2008) (holding that because no "factual determinations" are required to determine entitlement to prejudgment interest on a contract award, the trial court's decision is reviewed "de novo").

In this case, the district court denied prejudgment interest because plaintiffs failed to present evidence regarding the effect such interest would have on the adjusted amortization schedules. However, once it rendered a monetary judgment in favor of plaintiffs on the SPA, the district court lacked discretion to deny prejudgment interest. *See Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 693 (6th Cir. 2000) (applying Ohio law) ("If a favorable judgment award has been obtained by plaintiff, plaintiff has a right under [ORC §] 1343.03(A) to an interest award as a matter of law, and the trial judge has no discretion not to grant any interest award."); *Royal Elec. Constr. Corp. v. Ohio State Univ.*, 652 N.E.2d 687, 691-92 (Ohio 1995); *Stoebermann v. Beacon Journal Publ'g Co.*, 894 N.E.2d 750, 758 (Ohio Ct. App. 2008) (internal quotation marks and citations omitted) ("[O]nce a plaintiff receives judgment on a contract claim, the trial court has no discretion but to award prejudgment interest under [ORC §] 1343.03(A)."). Accordingly, we reverse the district court's order regarding prejudgment interest. Upon remand, the district court is directed to add prejudgment interest to its judgment.[6]

---

[6]While the subordinated term notes provide for an interest rate of 5% per annum, the growth plan, which sets forth the payments to plaintiffs Eggert and Nickell, does not address the issue of interest. Plaintiffs assert that the 5% interest rate provided in the subordinated term notes also applies to the growth plan and defendants do not contest this assertion. Upon review of the SPA, we find that the growth plan incorporates the calculations provided in the SPA, which in turn incorporates the 5% interest rate in the subordinated term notes. Accordingly, Eggert and Nickell are entitled to prejudgment interest calculated at 5% per annum. *See Christe v. GMS Mgmt. Co.*,705 N.E.2d 691, 693 (Ohio Ct. App. 1997) ("Where one instrument incorporates another by reference, both must be read together.").

V.

In sum, we affirm in part, reverse in part, and remand. We hold that the evidence was insufficient to support the district court's finding that the loss of the Summit County contract was attributable to defendants' breach of the SPA. In addition, we hold that the district court erred as a matter of law in refusing to award prejudgment interest. In all other respects, we affirm the district court. Upon remand, the district court is directed to amend its damages award and enter a judgment consistent with this opinion.