OPINION
Defendants-appellants TAS International, Inc. (hereinafter "TAS" or "appellants"), and John Apaydin appeal two judgment entries of the Stark County Court of Common Pleas, each entered on February 22, 1999. The first memorialized a jury verdict in favor of appellee and against appellants and entered judgment accordingly. The second judgment entry, also in accordance with the jury verdict, entered judgment in favor of appellee on appellants' counterclaims. Plaintiff-appellee is Graphic Enterprises, Inc. (hereinafter "GEI" or "appellee").
 STATEMENT OF THE FACTS AND CASE
This matter arises out of a contractual dispute between GEI and TAS. GEI provided fax machines and copiers to TAS. TAS then sold the equipment to the Turkish Ministry of National Education (hereinafter "Ministry"). After receipt and inspection, the Ministry found some of the equipment nonconforming. The Ministry rejected that portion of the equipment and withheld payment to TAS for the nonconforming goods. TAS then refused the final installment payment to GEI, claiming GEI was responsible for the Ministry's rejection of the goods. On April 30, 1997, GEI filed a complaint against TAS and Mr. Apaydin, the principal of TAS, alleging breach of contract and breach of a personal guarantee. Appellants' answer contained the affirmative defenses of good faith rejection of goods under the contract pursuant to R.C.1302.61; revocation of the acceptance of the goods covered by the agreement pursuant to R.C. 1302.66; the doctrine of unclean hands; fraud in the inducement; and the doctrines of waiver and equitable estoppel. Appellants also filed a counterclaim against appellee, in which appellants alleged breach of contract, misrepresentation, and indemnification. On February 18, 1998, the trial court granted appellants' motion to amend the answer and counterclaim, allowing appellants to assert an additional cause of action in the counterclaim for breach of express warranty. Appellee timely filed its answer to the counterclaim. On August 1, 1997, appellee filed a third party complaint against Telecom Corporation of Chicago, (hereinafter "Telecom"), and Reman USA, Inc. (hereinafter "Reman"), alleging indemnification against both Telecom and Reman. Each party filed a dispositive motion. In a May 15, 1998 Judgment Entry, the trial court denied each motion. The matter was tried before a jury from February 8, 1999 through February 19, 1999. The following evidence was adduced at trial. GEI, an office equipment company founded in 1970, is located in Canton, Ohio. TAS is an export business, founded by Mr. Apaydin in 1995. Mr. Apaydin is an optician with an office in Canton, Ohio. Mr. Apaydin had been trying to establish an export business which would export American goods to the Republic of Turkey since 1972. In 1994, GEI made an unsolicited sales call on Mr. Apaydin's optical practice. Because of Mr. Apaydin's interest in exporting copiers and fax machines to the Republic of Turkey, he established a relationship with GEI, hoping to use GEI as a supplier for potential bids made to the Turkish Government. In early 1995, Mr. Apaydin visited GEI's offices. Mr. Apaydin claimed he was told at that time GEI had two hundred copiers in its facility which could be "remanufactured" to operate on the Turkish power system. T. at 356. This process consisted of removing an American-compatible power supply and replacing it with a European-compatible power supply. Mr. Apaydin conceded he was not aware of any bid nor was he preparing any bids for the Ministry at the time of that meeting. T. at 355, 428-429. Soon thereafter, Mr. Apaydin learned the Ministry was accepting bids for office equipment. The Ministry sent TAS a two volume set of "bid books" detailing the rules and regulations for preparing a bid, and specific equipment sought. Volume I related to bid instructions and specified any equipment provided to the Ministry should be new. After receiving this information, TAS sought GEI's involvement in the bid preparation. Cynthia Hallock, formally known as Cynthia Cline, testified she worked as a secretary at Mr. Apaydin's optical practice. At trial, Ms. Cline conceded she could not recall if she gave GEI both volumes of the bid books. In fact, Ms. Cline only remembered sending Volume II. T. at 660. GEI helped TAS prepare a bid for the Ministry. At trial, Mr. Apaydin testified he understood only new products and equipment would be provided to the Ministry because the Ministry had specified new equipment in the bid books. Although Mr. Apaydin acknowledged he knew GEI planned to supply "remanufactured" equipment, he testified he understood "remanufactured" only meant GEI would convert the power supplies of the two hundred copiers currently in the GEI warehouse. This understanding was based upon the earlier conversation Mr. Apaydin had with Greg Frank, a manager at GEI. Mr. Apaydin's testimony was directly controverted by Richard Jusseaume, President and CEO of GEI. Mr. Jusseaume testified his first contact with Mr. Apaydin was in early 1995. T. at 89. Although not directly involved in the TAS deal, Mr. Jusseaume was concerned with any agreement to sell copiers or facsimiles to the Ministry, or any location in the Republic of Turkey, because of GEI's twenty-year relationship with the Minolta Corporation. GEI's contract with Minolta permitted GEI to sell equipment copiers and facsimiles only within fourteen counties in Northeastern Ohio. Because Mr. Jusseaume knew the copiers were to be sold in Turkey, he entered the 1995 meeting to verify that the copiers or facsimiles going to Turkey would be used or remanufactured equipment. If GEI sold new equipment for use outside any of the fourteen counties in Northeastern Ohio, GEI would violate its contract with Minolta, and jeopardize a long-standing relationship. Mr. Jusseaume testified he specifically discussed this topic with Mr. Apaydin in early 1995. Mr. Apaydin verified any equipment he would bid to the Turkish Government would be used or remanufactured. T. at 91-93. On August 10, 1995, TAS submitted a bid to the Ministry for 216 copiers and 180 fax machines. TAS claims this bid was based on a quote from GEI for 216 copiers and 180 Xerox 7011 fax machines. The quote was dated June 2, 1995, and did not specify whether the copiers and fax machines were to be new or remanufactured/used. Mr. Apaydin testified he relied upon GEI's expertise "in preparing their bid" (T. 360, 438-439), including a review of the Ministry's specifications contained in the bid books, and a selection of appropriate equipment which would comply with the Ministry's needs. Mr. Jusseaume testified he met with Mr. Apaydin for a second time in November of 1995. At that meeting, Mr. Apaydin told Mr. Jusseaume he had received the bid from the Ministry. Although Mr. Jusseaume was not involved in most of the negotiations between GEI and TAS, he attended this meeting to explain the procedure for purchasing used/remanufactured equipment. Mr. Jusseaume explained purchasing remanufactured or used equipment was not the same as purchasing brand new equipment from Minolta. With new equipment, Minolta would ship the equipment and allow GEI payment terms. However, with remanufactured or used equipment, money was due upon delivery. Because GEI was not in a financial position to pay for all of the used equipment required in the bid, Mr. Jusseaume attended the meeting to explain TAS would be required to put up a significant portion of the purchase price before GEI could set about acquiring the remanufactured equipment. T. at 94-95. The Ministry awarded TAS the contract on January 18, 1996, and the TAS entered into a formal written agreement with the Ministry on January 24, 1996. The final bid amount for the fax machines and copiers was $700,988.00. TAS and GEI then negotiated their contract for the fax machines and copiers. TAS was not represented by counsel in its negotiations with GEI. Pursuant to the contract, executed on May 20, 1996, TAS agreed to pay GEI $560,000.00 for the copiers, fax machines, and service related to the installation of and shipping of the products. The contract does not specify whether the copiers and facsimiles to be provided were to be new or remanufactured/used. At trial, Robert Urbaszewski, a previous employee of GEI, testified he assisted in negotiations surrounding the contract between GEI and TAS. Shortly before the final contract was signed, Mr. Urbaszewski learned from his suppliers the Model 7011 fax machines, which were part of the bid to the Ministry, were not available in the quantity required for the bid. Mr. Urbaszewski immediately contacted TAS and informed Ms. Cline of the potential problem. T. at 608. Mr. Urbaszewski testified Ms. Cline authorized the change in the draft contract permitting GEI to provide either 7010 or 7011 models. T. at 615. Mr. Apaydin and Ms. Cline contend when they attended the May 20, 1996 meeting to sign the final contract, Daryl Miller, GEI's treasurer, assured them the final version of the contract was identical to the final draft negotiated by the parties. Mr. Miller told Mr. Apaydin and Ms. Cline there was no need to read the contract before signing. Based upon this assurance, Mr. Apaydin signed the contract. Shortly after leaving the meeting, Mr. Apaydin noticed the first page of the document had been changed from the final draft agreement. The final contract stated either Xerox Model 7011 or 7010 fax machines could be supplied. Ms. Cline immediately contacted GEI to object to the addition of the 7010 model in the contract. Ms. Cline also faxed a letter to GEI about the matter on May 22, 1996. In response, GEI advised TAS, based on information received from its suppliers, the 7010 model was virtually identical to the 7011 model, except the 7010 model did not come with a phone. Because GEI's supplier was willing to supply a separate phone, the models were, for all intents and purposes, the same. Id. On June 13, 1996, TAS sent a proposed amendment of the contract deleting any reference to the 7010 model. GEI refused to accept the amendment. After further conversation, TAS chose not to pursue the matter further. At trial, Ms. Cline testified she believed GEI would supply the model 7011, notwithstanding the language of the contract and notwithstanding GEI's refusal to sign an amendment to the contract. Further, Ms. Cline testified she never asked for a definition for the term "remanufactured" because "I knew what it meant, power conversion and plugs; so I didn't call [GEI]." T. at 673. TAS shipped the equipment to Turkey in the fall of 1996. In February of 1997, the Ministry complained the copiers were used, not new as required by the bid book specifications, and refused to make final payment to TAS in the amount $140,197.60. The Ministry had already made partial payment to TAS in the amount of $560,790.40. The Ministry kept the copiers even though there were some problems requiring repair. GEI sent technicians to Turkey to repair the machines, but ultimately the copiers were never fixed. The Ministry then rejected those copiers. In addition, the Ministry rejected the fax machines. TAS bought new fax machines at their own expense. When GEI demanded final payment of the balance due on the contract between GEI and TAS, TAS refused. At the close of appellants' case, GEI moved for a directed verdict on appellants' counterclaim for fraud and misrepresentation. The trial court granted the motion and dismissed the misrepresentation count of the counterclaim. T at 1356-60. On February 19, 1999, the jury returned a verdict in favor of GEI on the complaint and in favor of GEI on appellants' remaining counterclaims, awarding damages in the amount of $142,108.00. The trial court memorialized these verdicts in two separate, February 22, 1999 Judgment Entries. Appellant appeals from those Judgment Entries, assigning the following as error:
 I. THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR DIRECTED VERDICT ON APPELLANTS' COUNTERCLAIM FOR FRAUD BY CONCLUDING THAT APPELLANTS WERE PRECLUDED FROM ASSERTING A FRAUD CLAIM SINCE THEIR CASE SOUNDED IN CONTRACT. (TRANSCRIPT PP. 1356-57.)
 II. THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR DIRECTED VERDICT ON APPELLANT'S COUNTERCLAIM FOR FRAUD BY CONCLUDING THAT THERE WAS NO EVIDENCE TO SUPPORT A JURY FINDING THAT APPELLEE WAS LIABLE FOR FRAUD. (TRANSCRIPT PP. 1356-57.)
 I
In the first assignment of error, appellants maintain the trial court erred in granting appellee's motion for a directed verdict on appellant's counterclaim for fraud based upon its conclusion appellants were precluded from asserting the fraud claim as the case sounded in contract. The standard of review for the grant or denial of a motion for directed verdict is: whether there is probative evidence which, if believed, would permit reasonable minds to come to different conclusions as to the essential elements of the case, construing the evidence most strongly in favor of the non-movant. Sanek v. Duracote Corp. (1989), 43 Ohio St.3d 169,172. Appellants argue Ohio law permits fraud claims in actions arising out of contract, and the trial court misapplied the law governing this action. In Ohio, a breach of contract does not create a tort claim. (Citation omitted). Generally, "the existence of a contract action * * * excludes the opportunity to present the same case as a tort claim." (Citation omitted). A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed. (Citations omitted). Textron Fin. Corp. v. Nationwide Mut. Ins. Co. (1996), 115 Ohio App.3d 137, 151.
Appellants submit the fraud claim exists independently of the breach of contract claim because GEI owed appellants a duty separate from the duty GEI owed appellants under the contract. Appellants predicate the fraud claim on GEI's failure to disclose material facts during their negotiations, during preparation of the bid for the Ministry, and in the drafting and execution of the contract. Specifically, the fact the fax machines supplied would be a different model number from the one discussed, and the fact the copy machines were used. We address the issue of the fax machines first. Appellants argue GEI failed to disclose the fax machines supplied under the contract would be Xerox Model No. 7010, rather than Model No. 7011. The sales contract executed between appellants and appellee specifically describes the fax machines to be supplied as "Xerox 7011 Facsimile or Xerox 7010 Facsimile." The parties do not dispute GEI supplied Xerox 7010 fax machines. Because the order was filled according to the contract terms, we find GEI cannot be held liable for fraud. Appellants claim GEI representatives told appellants not to read the contract before signing it because it was identical to the final draft. "A person of ordinary mind cannot be heard to say the he was misled into signing a paper which was different from what he intended, when he could have known the truth by merely looking when he signed." McAdams v. McAdams (1909), 80 Ohio St. 232, 240-241. "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written." Upton v. Tribilock (1875), 91 U.S. 45, 50. The legal and common-sensical axiom that one must read what one signs survives this case. To find for appellants would destroy that standard. Turning to appellants' contention a claim for fraud exists based upon GEI's failure to disclose the fact "remanufactured" copy machines were actually used machines, we note the contract does not specify whether the machines were to be new, used, or remanufactured. Assuming, arguendo, GEI fraudulently misrepresented the true character of "remanufactured" copy machines to appellants, we find the nature of GEI's conduct, be it fraudulent or negligent, is irrelevant as such does not change the contractual nature of appellant's claim. Any alleged failure by GEI to supply conforming goods is purely an issue of whether GEI breached the contract. We find this aspect of appellants' fraud claim cannot be separated from appellants' breach of contract claim. "In addition to containing a duty independent of that created by contract, an action arising out of contract which is also based upon tortious conduct must include actual damages attributable to the wrongful acts of the alleged tortfeasor which are in addition to those attributable to the breach of the contract." Textron, supra. (Citations omitted). Under Ohio Law, "[a]bsent a claim for personal injuries or property damage caused by defective products or goods, theories founded on tort law are not a substitute for warranty and contract principles under the Uniform Commercial Code, Article 2". Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co. (1989), 42 Ohio St.3d 40, 50. Review of the record reveals appellants did not establish or offer evidence of damages which were distinct from, and in addition to, those appellants claimed were suffered due to GEI's alleged breach of the contract. Appellants failed to establish damages beyond damages for economic losses. We find appellants did not differentiate the fraud claim from the breach of contract claim. Accordingly, because reasonable minds could only conclude, based upon the evidence presented, appellants failed to prove the essential elements of the fraud claim, we find the trial court did not err in granting GEI's motion for directed verdict Furthermore, we find, if the jury had found GEI committed fraud, such finding would be inconsistent with the jury's verdict in favor of GEI on its account claim. Implicit in the jury's verdict awarding GEI the monies due on account is a finding the jury did not find GEI breached the contract with appellants. Because breach of contract is an affirmative defense to GEI's claim on account, any finding of fraud on GEI's part by the jury would be inconsistent with the jury's implicit finding GEI did not breach the contract. Appellants' first assignment of error is overruled.
 II
In the second assignment of error, appellants contend the trial court erred in granting GEI's motion for directed verdict on appellants' counterclaim for fraud based upon its conclusion no evidence existed to support a jury's finding GEI liable for fraud. In light of our disposition of appellants' first assignment of error, we find appellants' second assignment of error to be moot.
The judgment of the Stark County Court of Common Pleas is affirmed.
FARMER, J. and EDWARDS, J. CONCUR.