[Cite as *Developers Diversified Realty v. Coventry Real Estate Fund II, L.L.C.*, 2012-Ohio-1056.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 97231

---

# DEVELOPERS DIVERSIFIED REALTY

### PLAINTIFF-APPELLEE

vs.

# COVENTRY REAL ESTATE FUND II, L.L.C., ET AL.

### DEFENDANTS-APPELLANTS

---

### JUDGMENT:
### AFFIRMED

---

Civil Appeal from the
Cuyahoga County Common Pleas Court
Case No. CV-710372

**BEFORE:** Blackmon, A.J., Celebrezze, J., and Rocco, J.

**RELEASED AND JOURNALIZED:** March 15, 2012

**ATTORNEYS FOR APPELLANTS**

Stephen M. Bales
Nicholas C. De Santis, III
Ziegler & Metzger LLP
925 Euclid Avenue
Suite 2020
Cleveland, Ohio 44115-1441


**ATTORNEYS FOR APPELLEE**

Robert S. Walker
Nicholas B. Wille
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190

PATRICIA ANN BLACKMON, A.J.:

{¶1}   Appellants Coventry Real Estate Fund II, L.L.C., Service Holdings L.L.C., Coventry II DDR Buena Park L.L.C., Coventry II DDR Fairplain L.L.C., Coventry II DDR/Tucker Marley Creek Square L.L.C., Coventry II DDR/Trademark Montgomery Farm L.P., Coventry II DDR Phoenix Spectrum SPE L.L.C., Coventry II DDR Totem Lake L.L.C., Thor Gallery at Tri County L.L.C., Coventry DDR II Ward Parkway L.L.C., and DDR DB 151 Ventures, L.P. (referred to collectively as "Coventry II") appeal from the trial court's granting of summary judgment in favor of Developers Diversified Realty Corporation ("DDR") and assign five errors for our review.[1]

{¶2}   Having reviewed the record and requisite law, we affirm the trial court's decision.   The apposite facts follow.

## Facts

{¶3}   DDR is an Ohio corporation with its principal place of business in Beachwood, Ohio.   DDR is in the business of development, ownership, management, leasing, and property management of open air retail shopping centers and is involved with about 700 properties in 44 states and several countries.   Coventry Real Estate Advisors, L.L.C. ("CREA") is a real estate investment manager with offices in New York City and Chagrin Falls, Ohio.

---

[1]See appendix.

**{¶4}** DDR and CREA have participated together in two investment platforms over the past 11 years. In each, CREA and DDR contributed capital to acquire retail real estate properties whose value could be increased through development, redevelopment, or resale. DDR would invest 20 percent of the capital, while CREA would find other investors to contribute 80 percent of the remaining capital. Because of DDR's experience and expertise, the deals were structured so that DDR would be retained under the management and development contracts to supervise the development or redevelopment of projects and manage the projects that were in operation.

**{¶5}** The first of these investment platforms, Coventry Real Estate Fund I ("Coventry I"), existed from 1998 through 2007. Eventually, the projects in Coventry I were sold, earning a 30 percent return. In 2003, DDR and CREA desired to continue the investment success of Coventry I through a different pool of capital (Coventry II). Similar to Coventry I, each property acquired under the investment agreement became an asset of a separate limited liability company whose members included DDR and Coventry II. Coventry II consisted of 11 limited liability companies, who are all defendants in the case, owning 10 different properties. Like in Coventry I, under each project management agreement, DDR was the exclusive property manager and leasing agent for the properties.

**{¶6}** Each management agreement for the properties contained identical termination provisions allowing for termination of DDR either "without cause" or "for cause." If Coventry II terminated DDR's services without cause, there was a formula for

the amount of additional unearned fees that DDR would receive upon termination, and a buy-sell provision was triggered, which gave DDR the right to either buy or sell to Coventry II the property in question. If DDR was terminated for cause, defined as willful misconduct, fraud, or gross negligence by a DDR executive officer, DDR was not entitled to the unearned fees and the buy-sell provision would not be triggered.

{¶7} On November 4, 2009, Coventry II, without any notice to DDR, issued a press release asserting that DDR had engaged in a long pattern of willful and fraudulent behavior designed to intentionally destroy the value of the parties' various joint ventures and announced it was terminating the management agreements with DDR "for cause." Thereafter, on November 5, 2009, Coventry II filed a breach of contract suit against DDR in New York.[2]

{¶8} On November 6, 2009, DDR received a single-page letter from Coventry II stating it was terminating the management agreement with DDR "for cause," effective December 5, 2009. The letter did not explain what constituted the grounds for the "for cause" termination but alluded to the allegations in its complaint filed in New York.

{¶9} On November 18, 2009, DDR filed a complaint for declaratory judgment in the Cuyahoga County Court of Common Pleas, seeking to have the court declare Coventry II's termination for cause invalid because there was no evidence that DDR engaged in fraud or willful misconduct. DDR also requested a temporary restraining

---

[2]*Coventry Real Estate Advisors, LLC v. Developers Diversified Realty Corp.,* N.Y. S.Ct. No. 1155909.

order ("TRO") and a preliminary injunction, requesting the court allow DDR to remain the property manager while the litigation was pending so that the status quo could be maintained, especially during the busy holiday shopping season, and to prevent further harm to its reputation. The trial court conducted a TRO hearing and granted the TRO, stating in pertinent part:

> **DDR is likely to succeed on the merits, that immediate and irreparable injury, loss, or damage will result to DDR in the absence of restraint, that DDR has no adequate remedy at law, that the balance of equities favors injunctive relief in favor of DDR, and that the public interest will not be harmed by injunctive relief in favor of DDR.**

{¶10} Coventry II, thereafter, stipulated to the restraining order continuing to be enforced until the litigation concluded.

{¶11} DDR filed a motion for summary judgment regarding its declaratory judgment. DDR argued that Coventry II's sole justification for the "for cause" termination was its speculation that DDR's senior management, Executive Chairman Scott Wolstein and Chief Executive Officer and President Daniel Hurwitz, were purposely undermining the success of Coventry II. DDR argued that there was no evidence, beyond speculation, of such a scheme and that Coventry II was not successful because of the severe economic problems experienced by the entire country. DDR further argued that it was illogical to argue that DDR wanted the venture to fail when DDR, itself, was a 20 percent owner of the properties.

{¶12} In its brief in opposition, Coventry II argued an injunction should not be ordered even if DDR was not terminated for cause. It also set forth a new justification

for its "for cause" termination. Coventry II argued that DDR fraudulently concealed its relationship with Oxford Building Services ("Oxford"). Oxford is a vendor DDR uses to help manage all of its properties, not just the properties it owns with Coventry II. Oxford in turn uses a nationwide computer system and DDR's buying power due to its ownership of over 700 properties to bid the contracts out to individual vendors for the most cost effective price. Oxford charges the vendors a 3 percent surcharge fee of which DDR receives 75 percent.

{¶13} Coventry II claimed that DDR's nondisclosure of its relationship with Oxford was fraudulent. It also argued, without supporting evidence, that the 3 percent fee that Oxford charged its vendors increased Coventry II's maintenance costs. Coventry II also argued that DDR's receipt of 75 percent of the 3 percent fees resulted in fraudulent kick-backs to DDR.

{¶14} After conducting a summary judgment hearing, the trial court, in a 15-page opinion, granted summary judgment as a matter of law in favor of DDR, concluding there was no evidence of fraud or willful misconduct that would support a termination "for cause." The court concluded that the conduct complained of was governed by the management contract; thus, any alleged wrongdoing by DDR would constitute a breach of contract and not fraudulent or willful misconduct. The trial court also denied Coventry II's motion to stay or dismiss the case in favor of the New York case.

## Summary Judgment

**{¶15}** In its first, second, and third assigned errors, Coventry II argues the trial court erred by granting summary judgment in favor of DDR.

**{¶16}** We review an appeal from summary judgment under a de novo standard of review. *Baiko v. Mays*, 140 Ohio App.3d 1, 746 N.E.2d 618 (8th Dist.2000), citing *Smiddy v. The Wedding Party, Inc.*, 30 Ohio St.3d 35, 506 N.E.2d 212 (1987); *N.E. Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 699 N.E.2d 534 (8th Dist.1997). Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. Under Civ.R. 56, summary judgment is appropriate when: (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can reach only one conclusion that is adverse to the non-moving party.

**{¶17}** In the instant case, the trial court concluded summary judgment was appropriate as a matter of law because the evidence did not show that DDR's conduct constituted fraud or willful misconduct. The court concluded that DDR's conduct, if indeed wrong, constituted a breach of the contract, which is not one of the listed bases in the agreement for termination for cause. In so holding, the trial court cited to *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 684 N.E.2d 1261 (9th Dist.1996), which held that a breach of a contract could not constitute fraud.

{¶18}     Coventry II maintains *Textron* is distinguishable because it is not attempting to bring a fraud claim as the plaintiff in *Textron* was.   Instead, Coventry II is contending DDR's fraudulent conduct constituted grounds for terminating the contract for cause pursuant to the management agreement.   We conclude this is a distinguishment without a difference.   By citing *Textron*, the court was acknowledging that when a relationship is contractual and one party fails to perform to the other's expectations, the result is a breach of contract; thereby making it difficult, if not impossible, to support an allegation of fraud.

{¶19} Although Coventry II on appeal defines fraud and willful misconduct as set forth in Black's Law Dictionary, at the summary judgment hearing, Coventry II stipulated that because the terms were not defined in the agreement that the parties intended to use the legal meaning of the terms.   Thus, the parties agreed that a "for cause" termination must be founded on conduct that satisfies the legal requirements of an action for fraud or willful misconduct.

{¶20}     To prove DDR's conduct constituted fraud, Coventry II had to show (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it was true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury

proximately caused by the reliance. *Gaines v. Preterm–Cleveland, Inc.*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987).

{¶21} To prove "willful misconduct," it is necessary to show "an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing some wrongful acts with knowledge or appreciation of the likelihood of injury." *Brenner v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 8th Dist. No. 91712, 2009-Ohio-1253, 2009 WL 713014, ¶ 24.

{¶22} Coventry II contends DDR committed fraud by entering into an agreement with Oxford to perform the duties DDR was obligated to provide under the contract. We agree with the trial court that DDR had no duty to disclose its agreement with Oxford. The management agreement explicitly gives DDR the ability to delegate management duties as it deems necessary. According to the agreement, DDR has the "sole and exclusive authority to take such actions, and perform such duties as [DDR] deems necessary and desirable for the care, protection, operation, maintenance, repair, replacement, and leasing of the Properties." Management Agreement, Art. II. DDR may also "enter into such contracts and other agreements for utilities and other services either required or deemed as desirable by the Property Manager in connection with the operation of the Properties." Management Agreement, Section 2.8. The only limitation to DDR's power to enter into contracts is that Section 2.8 requires that DDR "respect its

fiduciary duty" owed to Coventry II. Thus, any breach of that duty would constitute a breach of the contract, not an intentional tort.

**{¶23}** Interestingly, the New York court dismissed Coventry II's breach of fiduciary duty claim against DDR, which was based on DDR's relationship with Oxford. In refusing to reconsider its dismissal of the claim, the New York court held:

> **Although the Management Agreement § 2.8 requires DDR to "respect its fiduciary duty" to the Property Owner REIT in the execution of contracts for services and supplies, DDR's failure to do so with respect to the contract with Oxford would result in a breach of contract claim, not a tort claim for breach of fiduciary duty.** New York Journal Entry, Dec. 8, 2010.

**{¶24}** Coventry II also claimed that DDR acted fraudulently by concealing the details of its contract with Oxford. However, as the trial court concluded, the Management Agreement does not require disclosure of the contracts DDR enters into on behalf of the property. Any disclosure requirements would be contained in Section 2.5 of the Management Agreement, which basically requires DDR to maintain records of income and expenses and give Coventry II this information monthly, along with tax information Coventry II may need. If DDR had a duty pursuant to Section 2.5 to disclose the details of the Oxford contract, such conduct would amount to a breach of contract, not tortious conduct.

**{¶25}** Coventry II also claimed that DDR committed fraud by leading Coventry II to believe that the costs of the Oxford program were borne solely by DDR. The evidence indicated that Oxford charged vendors a 3 percent fee and that DDR was given 75 percent of these fees. However, there is no evidence that the 3 percent fee resulted in an added expense to Coventry II or that Coventry II did not receive value by achieving a cost savings. Coventry II attached the affidavit of Loren F. Henry, the vice president of CREA, in which he stated that DDR's relationship was fraudulent and created additional costs to Coventry II. However, as the trial court concluded, Henry's allegations constituted breach of contract claims. As the trial court found:

> **There is no record evidence to support an inference that DDR's contract with Oxford amounts to stealing from Coventry. First, DDR has entered into the contract with Oxford for all its properties, not just those that are co-owned with Coventry. That fact does not allow a reasonable inference that the Oxford vendor management program amounts to stealing from the property owner, since it would never be reasonable to infer that DDR would steal from itself on properties it owns. Second, there is no evidence that Coventry did not approve budgets for 2008 and 2009, the first two years of the Oxford program. Since the disputed 3% surcharge was ultimately included in those budgets, Coventry's approval suggests either that even with the 3% surcharge the budgets were reasonable and acceptable to Coventry, or**

**that the program achieved the cost savings it was designed for. Finally, Coventry has produced no evidence that the 3% charge actually increased its property management expense by that amount or that it didn't generate value to the properties that was worth the expense. Indeed, the stated goals fo the Oxford program are "to recognize the value of critical mass and purchasing power" of DDR's portfolio to allow "cost savings" — i.e., to get better deals from contractors — and to "enable our property managers to spend more of their valuable time" servicing tenants.** Judgment Entry, Aug. 2, 2011 at 11.

**{¶26}** Although Henry claimed the contract with Oxford resulted in more expenses, Coventry II failed to present evidence of budgets and expenses of prior years to compare with the current expenses. Instead, Henry alluded to records of Coventry II's that were not part of the record.

**{¶27}** In addition to the lack of evidence that the Oxford contract or 3 percent surcharge constitutes stealing, any failure by DDR to give Coventry II part of the rebate would constitute a breach of contract. Section 2.8 of the Management Agreement states in pertinent part that DDR "shall attempt to secure for, and credit to, [Coventry II] any discounts, commissions or rebates obtainable as a result of such contracts or orders." Thus, DDR's failure to give Coventry II a portion of the rebates would constitute a breach of contract.

**{¶28}** Finally, Coventry II contended that DDR purposefully did not lease various properties in an effort to sabotage Coventry II's efforts to be successful. However, the only evidence of this that Coventry II provides is the statement of Peter Henkel, the president and chief executive officer of Service Holdings, LLC, in which he compared the success of the first Coventry venture compared to the poor performance of the second venture. His comparison did not take into account the fall-out of the real estate market that occurred during the second venture, which created a difficult market to obtain retail tenants. Moreover, there was no evidence that the DDR senior executive officers intended to make the venture unsuccessful. Henkel merely speculates that "this was a plan carried out under the direction" of the senior management team. In addition, it is illogical to argue DDR wanted the venture to fail when it was 20 percent invested in the venture. Accordingly, Coventry II's first, second, and third assigned errors are overruled.

### Trial Court's Failure to Stay or Dismiss the Case

**{¶29}** In its fourth assigned error, Coventry II argues the trial court erred by refusing to stay or dismiss the Ohio case. Specifically, Coventry II argues that because New York acquired jurisdiction first, the Ohio case should have been stayed or dismissed.

**{¶30}** The rule of jurisdictional priority applies only to "actions pending in different Ohio courts that have concurrent jurisdiction." *Nationwide Mut. Fire Ins. Co. v. Modroo*, 11th Dist. No. 2004-G-2557, 2004-Ohio-4697, 2004 WL 1960087, ¶ 12, citing *Hoppel v. Greater Iowa Corp.*, 68 Ohio App.2d 209, 210, 428 N.E.2d 459 (9th

Dist.1980). "[I]t does not apply when an action is pending in another state as in this case." *Nationwide* at ¶ 12. *See also Carlin v. Mambuca*, 96 Ohio App.3d 500, 645 N.E.2d 737 (8th Dist.1994).

{¶31} In *Hoppel*, the court stated that "[t]he fact that an action is pending in another state does not constitute a defense to an action between the same parties over the same cause of action in Ohio." *Hoppel*, 68 Ohio App.2d at 210; *see also Long v. Grill*, 155 Ohio App.3d 135, 2003-Ohio-5665, 799 N.E.2d 642, at ¶ 27 (10th Dist.) (holding that "the pendency of the action in California, involving the same subject matter and the same parties, does not preclude the Ohio trial court's exercise of jurisdiction to adjudicate plaintiff's complaint"). An Ohio trial court in such a situation retains jurisdiction over the matter and has several options: it can grant a stay in the Ohio proceedings pending the resolution of the earlier action outside of Ohio, or it can go forward with the action in Ohio. *Hoppel*, 68 Ohio App.2d at 210, 428 N.E.2d 459. The Ohio Supreme Court has also held the court can dismiss the action pursuant to the doctrine of forum non conveniens. *Chambers v. Merrell-Dow Pharmaceuticals, Inc.*, 35 Ohio St.3d 123, 519 N.E.2d 370 (1988). The *Chambers* court stated that the doctrine "allows a court having proper jurisdiction to dismiss an action when to do so would further the ends of justice and promote the convenience of the parties * * *." *Id*. at 125. Furthermore, *Chambers* held that the ability of a court to dismiss an action under forum non conveniens is an inherent power of the court and within its sound discretion. *Id*.

**{¶32}** We conclude the trial court did not abuse its discretion by refusing to stay or dismiss the case. The Ohio case was filed within weeks of the New York case. Therefore, not much discovery had occurred in the New York case. The New York court also stayed the issues before it that may have been impacted by the Ohio court's decision.

**{¶33}** Also, the New York court seemed to agree that there was not a danger of inconsistent verdicts. DDR filed a motion in the New York court to dismiss Coventry's complaint because of a potential conflict with the Ohio case. However, the New York court concluded:

> **In this action, there in no danger of inconsistent verdicts. The only issue in the first Ohio case[3] is whether Coventry properly terminated DDR's Management Agreements for cause. Termination for cause relates to the fourth cause of action for breach of the Management Agreements and the sixth cause of action for fraud, as fraud is a ground for termination for cause. The court has contacted the Staff Attorney for the Ohio Court of Common Pleas for Cuyahoga County and has been advised that the pretrial conference is scheduled for August 31, 20[10] and the trial is scheduled for September 27, 20[10]. As discovery has hardly begun in this action, this court can refrain from making decisions on those two causes of action until after the Ohio trial is concluded. The second Ohio action has been stayed in favor of this one, which eliminates the possibility of inconsistent verdicts.** New York Journal Entry, June 23, 2010.

**{¶34}** The parties also agreed in the management agreements that an Ohio court would hear and decide all disputes regarding the agreement. *See Info. Leasing Corp. v.*

---

[3]DDR also filed a complaint for payment of management fees, which the trial court stayed in favor of the New York litigation. Thus, there is a second case in the Cuyahoga County Court of Common Pleas.

*Jaskot,* 151 Ohio App.3d, 549, 2003-Ohio-566, 784 N.E.2d 1192 (1st Dist.) (holding that trial court abused its discretion in dismissing the complaint on forum non conveniens grounds where contract at issue contained an Ohio Forum selection clause). Accordingly, we conclude the trial court did not abuse its discretion by denying Coventry II's motion to stay or dismiss the case. Coventry II's fourth assigned error is overruled.

## Temporary Restraining Order

**{¶35}** In its fifth assigned error, Coventry II argues the trial court erred by granting DDR's motion for a TRO.

**{¶36}** "A temporary restraining order makes no final adjudication for any issue. Such orders merely prevent designated parties from exercising their claimed rights pending a determination of the merits." *Gessler v. Madigan*, 41 Ohio App.2d 76, 322 N.E.2d 127 (3d Dist.1974). Such is the case here. The order purported to maintain the status quo until the litigation concluded. Moreover, once the trial court issued its judgment on the complaint for declaratory judgment, the restraining order was rendered moot. *Black v. Hall*, 8th Dist. No. 94113, 2010-Ohio-4677, 2010 WL 3814586. Accordingly, Coventry II's fifth assigned error is overruled.

**{¶37}** Judgment affirmed.

It is ordered that appellee recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, ADMINISTRATIVE JUDGE

FRANK D. CELEBREZZE, JR., J., and
KENNETH A. ROCCO, J., CONCUR

## APPENDIX

### Assignments of Error

**I.   The trial court erred by granting plaintiff-appellee's motion for summary judgment as: (a) genuine issues of material fact existed warranting a trial of the matter; and (b) plaintiff-appellee was not entitled to judgment as a matter of law.**

**II.   The trial court misconstrued the management and leasing agreements as a matter of law.**

**III.   The trial court erred as a matter of law by determining that defendant-appellant's termination "for cause" of plaintiff-appellee under the management and leasing agreements was invalid.**

**IV.   The trial court erred by denying defendants-appellants' motion to dismiss or alternatively motion to stay proceedings.**

**V.   The trial court erred by granting plaintiff-appellee's motion for temporary restraining order.**