[Cite as *Plus Mgt. Servs., Inc. v. Liberty Healthcare Corp.*, 2024-Ohio-3127.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| PLUS MANAGEMENT SERVICES, INC. | : | |
| | : | |
| | : | C.A. No. 29858 |
| Appellees/Cross-Appellants | : | |
| | : | Trial Court Case No. 2017 CV 04263 |
| v. | : | |
| | : | (Civil Appeal from Common Pleas |
| LIBERTY HEALTHCARE CORPORATION, et al. | : | Court) |
| | : | |
| | : | |
| Appellant/Cross-Appellee | | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 16, 2024

. . . . . . . . . . .

ANNE MARIE SFERRA and CHRISTOPHER GORDON, Attorneys for Appellant/Cross-Appellee

TERRENCE G. STOLLY, CONNOR W. KINSEY, MATTHEW T. WATSON and CHRISTOPHER R. BUTLER, Attorneys for Appellees/Cross-Appellants

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} Liberty Healthcare Corporation and its principal, Linda Black-Kurek,

(collectively "Liberty") appeal from the trial court's entry of final judgment in favor of Plus Management Services, Inc. ("Plus") following a partial summary judgment and jury verdicts in Plus's favor on several claims.[1] Liberty also appeals from the trial court's disposition of post-trial motions and from the trial court's awarding of prejudgment interest to Plus. In a cross-appeal, Plus challenges the trial court's entry of a directed verdict for Liberty and Black-Kurek on punitive damages.

{¶ 2} With regard to Liberty's appeal, we conclude that the trial court erred in allowing Plus to obtain triple recovery of $280,000 by (1) entering summary judgment in Plus's favor for $280,000, (2) entering judgment on a jury verdict for conversion that necessarily included the $280,000, and (3) entering judgment on a jury verdict for breach of contract that included the same $280,000. The trial court also erred in awarding prejudgment interest where Plus's motion for such interest was untimely. As for Plus's cross-appeal, the trial court did not err in directing a verdict for Liberty and Black-Kurek on punitive damages.

{¶ 3} The trial court's entry of final judgment for Plus will be affirmed in part and reversed in part. The trial court's entry of a directed verdict for Liberty and Black-Kurek on punitive damages issue will be affirmed.

### I. Background

{¶ 4} The present appeal stems from Liberty's operation and subsequent purchase of a nursing home and residential-care facility owned by Plus. On January 11, 2017, the

---

[1] We note that Liberty and Black-Kurek appealed separately. Black-Kurek styled her notice of appeal as a "cross appeal/multiple appeal" under App.R. 4(B), apparently because she filed it after Liberty's appeal and after a cross-appeal by Plus.

parties executed two agreements: an interim operating agreement and a purchase-and-sale agreement. The interim operating agreement authorized Liberty to manage Plus's facilities prior to closing of the purchase-and-sale agreement, which occurred on April 21, 2017. The interim operating agreement provided for Liberty to supply working capital "in an amount not to exceed $2,000,000 during the term of this Agreement." This cash infusion was referred to as the "Manager's Contribution." Under the agreement, any unpaid balance was to be off-set against the purchase price at closing or otherwise repaid. The Manager's Contribution was intended to enable Plus's facilities to continue operating until closing of the purchase-and-sale agreement.

{¶ 5} Prior to closing, Liberty made total Manager's Contributions of $2.54 million. The outstanding principal balance never exceeded $2 million, however, because Liberty periodically repaid itself from Plus's operating accounts over which Liberty had control. Shortly before closing, a dispute arose over whether Liberty had made unnecessary capital expenditures to improve the condition of the facilities prior to closing rather than simply paying required operating expenses. The parties also disagreed about whether the interim operating agreement imposed a hard cap of $2 million on Liberty's cash infusion or whether it was a revolving line of credit, meaning that Liberty could contribute an unlimited amount of money as long as the outstanding balance never exceeded $2 million. Ultimately, the parties agreed to a $280,000 reduction in the amount repayable by Plus at closing on the Managers' Contribution. They memorialized this agreement in a second amendment to the purchase-and-sale agreement. It provided: "[T]he amount payable as of the Closing Date for the Manager's Contribution * * * including any accrued

interest with respect to the Manager's Contribution, shall be reduced by $280,000."

**{¶ 6}** At closing, the balance owed on the Manager's Contribution was $2,059,702. This exceeded the $2 million limit by $59,702 but only at Plus's explicit request to meet payroll. On the closing statement, Liberty received a credit of $1,779,702 for its Manager's Contribution. This amount was calculated by taking the outstanding balance of $2,059,702 and subtracting the negotiated $280,000 reduction.

**{¶ 7}** After the transaction closed, Liberty took the position that it was entitled to recoup the $280,000 as a post-closing adjustment by collecting and retaining accounts receivable that otherwise would have belonged to Plus. Liberty claimed the negotiated language reducing "the amount payable as of the Closing Date for the Manager's Contribution" was not intended to forgive $280,000 of debt. Rather, Liberty asserted that the amendment was intended to increase the cash to Plus at closing while saddling Liberty with the burden of recouping those funds post-closing through Plus's potentially uncollectable accounts receivable.

**{¶ 8}** After taking ownership of the facilities, Liberty collected $382,490 in accounts receivable that would have belonged to Plus under the purchase-and-sale agreement. Liberty retained $280,000 of this amount as a post-closing adjustment to recoup its full Manger's Contribution. According to Liberty, the remainder of Plus's accounts receivable were offset by accounts payable for which Plus bore responsibility.

**{¶ 9}** Plus sued Liberty and its principal, Linda Black-Kurek, in September 2017.[2] Plus later filed an amended complaint in August 2018. Among other things, it alleged

---

[2] Plus's complaint also named other defendants who later were dismissed and have no relevance to this appeal.

breach of the purchase-and-sale agreement, breach of the interim operating agreement, conversion, and fraud. The complaint also sought a declaratory judgment that Liberty was not entitled to recoup the $280,000 reduction in the Manager's Contribution. In a January 3, 2020 ruling on competing summary-judgment motions, the trial court found a genuine issue of material fact as to whether the Manager's Contribution language in the interim operating agreement created a revolving line of credit that could not exceed a $2 million balance or whether it created hard cap of $2 million on Liberty's cash infusion.

{¶ 10} With regard to the negotiated $280,000 reduction in Plus's amount payable as of the closing date for the Manager's Contribution, the trial court found the amended language in the purchase-and-sale agreement unambiguous. It determined that the reduction was final and that Liberty had no right to recoup $280,000 by withholding Plus's accounts receivable after closing. The trial court characterized the reduction as "a negotiated reduction of a liquidated sum, as opposed to a mere deferral of the amount owed to an unspecified future date." As a result, the trial court entered summary judgment for Plus on its declaratory-judgment claim, finding Plus entitled to judgment in the amount of $280,000. The case then proceeded to a jury trial against Liberty and Black-Kurek.

{¶ 11} Following several days of testimony, the jury returned the following verdicts for Plus and against Liberty: (1) breach of the purchase-and-sale agreement: $10.00; (2) breach of the interim operating agreement: $540,000; (3) conversion: $382,490; and (4) fraud: $10.00. The jury also returned a $10.00 verdict in favor of Plus and against Black-Kurek for fraud. The trial court entered judgment on these verdicts and on its earlier summary judgment that had found Plus entitled to $280,000.

{¶ 12} After hearing additional evidence on Plus's request for punitive damages and attorney fees, the trial court directed a verdict for Liberty and Black-Kurek on those issues. The trial court later overruled a motion for judgment notwithstanding the verdict and a new-trial motion filed by Liberty and Black-Kurek. Finally, the trial court sustained a motion for prejudgment interest filed by Plus.

## II. Liberty's Appeal

{¶ 13} Liberty advances four assignments of error on appeal. The first three assignments of error state:

I. The trial court erred, as a matter of law, in granting summary judgment against Appellant/Cross-Appellee Liberty in the amount of $280,000 based on the Purchase and Sale Agreement because the trial court disregarded language in the agreement to reach this conclusion. Further, reference to this ruling tainted the jury's verdict and prejudiced Liberty.

II. The trial court erred in allowing the jury to consider the conversion claim (which is a tort claim) because the conversion claim was based on the parties' rights and obligations under the contract and, thus, was barred as a matter of law by the economic loss doctrine. Further, the jury's verdict on the conversion claim is duplicative, excessive, and not supported by the evidence.

III. The jury's award of $540,000 for breach of the interim operating agreement must be reversed because Plus presented no evidence that it

suffered any loss as a result of Liberty contributing more than $2 million to keep Plus from shuttering its nursing home and/or having to file for bankruptcy.

{¶ 14} Liberty's first three assignments of error are related insofar as they address Plus's triple recovery of the same $280,000. The trial court first entered summary judgment for Plus in the amount of $280,000, finding that Liberty improperly had recouped this amount post-closing by collecting and retaining accounts receivable that belonged to Plus under the terms of the purchase-and-sale agreement.

{¶ 15} The jury then returned a $382,490 verdict for Plus on its conversion claim. This was the amount of accounts receivable belonging to Plus that Liberty collected post-closing. The $382,490 in accounts receivable was the source from which Liberty recouped the disputed $280,000 on its Manager's Contribution. But the trial court's summary judgment already had awarded Plus $280,000 of the $382,490 in accounts receivable retained by Liberty post-closing.

{¶ 16} Finally, the jury returned a $540,000 verdict for Plus based on Liberty's breach of the interim operating agreement. This verdict represented the dollar amount by which Liberty's aggregate Manager's Contribution had exceeded $2 million. The verdict established that the jury necessarily found $2 million to be a hard cap on the funds Liberty was authorized to infuse into Plus's facilities rather than a revolving line of credit. As set forth above, the parties had negotiated a $280,000 reduction in the amount owed by Plus on the Manager's Contribution, and the trial court's summary judgment already had awarded that amount to Plus. At the time of trial, then, Plus's remaining damages for

Liberty's breach of the interim operating agreement by exceeding the $2 million hard cap could not have exceeded $260,000 ($540,000 - $280,000).

{¶ 17} The only scenario under which Plus could have been damaged in the amount of $540,000 (based on Liberty's exceeding the $2 million cap) *and* another $280,000 (based on Liberty's making unnecessary improvements) would be if the maximum allowable $2 million investment would have been unnecessary but for the challenged improvements. The interim operating agreement authorized, but did not require, Liberty to provide up to $2 million in working capital to be used for "expenses of operations necessary to continue" the facilities' operation until closing. So, hypothetically, if the disputed capital improvements had totaled $820,000, Plus potentially could have claimed entitlement to both the $540,000 verdict (for Liberty's exceeding the $2 million cap) and still another $280,000 (for Liberty's making unnecessary expenditures to even reach the $2 million cap). But that was not the case. Plus owner Jerome O'Neal testified at trial and specifically identified only $334,235.69 in disputed "capital improvements" by Liberty that "had nothing to do with the operation of the nursing home." Trial Transcript Vol. II at 353. From this amount, O'Neal negotiated a $280,000 reduction in the amount payable at closing on the Manager's Contribution. Under these circumstances, the $280,000 reduction necessarily was included in the jury's $540,000 verdict for Liberty's breach of the interim operating agreement.

{¶ 18} On appeal, Plus disputes obtaining multiple recoveries of the same $280,000, but we fail to see how the result could be otherwise. O'Neal acknowledged at trial that the $280,000 was "taken back by Liberty after the closing." Trial Transcript Vol.

II at 358. Post-closing, however, the only money belonging to Plus that Liberty could have recouped came from accounts receivable that Liberty subsequently collected. Under the terms of the purchase-and-sale agreement, Plus had a right to these funds if they were for services rendered prior to the closing. Georgiana Saffle, who had been Plus's senior vice president, confirmed at trial that Plus had no right to any other money after the transaction closed. Trial Transcript Vol. I at 220, 226. Therefore, when Liberty recouped $280,000 from Plus post-closing it necessarily took the money from accounts receivable belonging to Plus. Once again, however, the trial court's summary judgment already had awarded Plus this $280,000 before trial. The jury's conversion verdict, which was in the exact amount of the post-closing accounts receivable, necessarily included the same $280,000, as did the $540,000 jury verdict for breach of the interim operating agreement by exceeding the $2 million hard cap. With the foregoing observations in mind, we turn to the merits of Liberty's assignments of error.

## A. Breach of the Interim Operating Agreement

{¶ 19} We first will address the third assignment of error, which challenges the jury's award of $540,000 for breach of the interim operating agreement. Liberty contends the agreement unambiguously made the Manager's Contribution a revolving line of credit that could not exceed a $2 million balance. Liberty insists that it did not breach the interim operating agreement because the outstanding balance never exceeded $2 million (except for a requested cash infusion shortly before closing to enable Plus to meet payroll). Although Liberty infused a total of $2.54 million into Plus's facilities, it periodically repaid itself prior to closing with funds in Plus's operating accounts.

{¶ 20} As set forth above, the jury's $540,000 verdict in favor of Plus based on Liberty's breach of the interim operating agreement made clear that it rejected Plus's reading of the language governing the Manager's Contribution. By awarding Plus $540,000 in damages, the jury necessarily found that the interim operating agreement capped Liberty's cash infusion at $2 million in the aggregate. This determination was consistent with the agreement's language. The applicable provision stated: "Manager [i.e., Liberty] shall provide working capital as deemed necessary by Manager in an amount not to exceed $2,000,000 during the term of this Agreement (collectively, the 'Manager's Contribution).' " We find this language to be unambiguous. It authorized Liberty to make a cash infusion "in an amount not to exceed $2,000,000." It said nothing about not exceeding a $2 million balance at any one time. Liberty violated the agreement by providing working capital in an amount that did exceed $2 million. But even if we accept arguendo that the language was ambiguous, the jury reasonably concluded that it created a hard cap limiting Liberty's aggregate contribution to $2 million.

{¶ 21} Liberty also contends Plus was not damaged by receiving working capital of $2.54 million to keep its operations afloat until the closing. The jury reasonably found otherwise. Plus's witnesses testified about Liberty's making unnecessary capital expenditures to improve the condition of the facilities prior to closing. *See, e.g.,* Trial Transcript Vol. I at 141, 147, 153, 156; Trial Transcript Vol. II at 236, 351-353. While doing so, Liberty maintained a Manager's Contribution balance below $2 million by periodically repaying itself from Plus's operating accounts over which it had control. Therefore, Plus effectively was paying Liberty to improve the condition and value of facilities that Liberty

was about to purchase. Although Liberty disputes this characterization, it was supported by testimony from Plus's witnesses. Plus was damaged because there was less money available to it in its accounts at closing than there would have been if Liberty had not infused more than $2 million into the business and repaid itself from Plus's own operating funds. Trial Transcript Vol. I at 143-144, 156. This is the type of scenario that the Manager's Contribution language in the interim operating agreement seems to have been intended to prevent.

{¶ 22} For the foregoing reasons, the trial court did not err in entering judgment against Liberty on the jury's $540,000 verdict in favor of Plus for breach of the interim operating agreement. Liberty's third assignment of error is overruled.

### B. Conversion

{¶ 23} In its second assignment of error, Liberty argues that Plus's tort claim for conversion was barred by the economic-loss rule. Alternatively, if the claim was not barred, Liberty asserts that the amount of the verdict was duplicative, excessive, and unsupported by the evidence.

{¶ 24} Upon review, we conclude that Plus had no viable conversion claim. This court summarized the economic-loss rule in *Moyer v. Abbey Credit Union, Inc.*, 2020-Ohio-5410 (2d Dist.), as follows:

> "[I]n Ohio, '[t]he economic-loss rule generally prevents recovery in tort of damages for purely economic loss.' *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 106 Ohio St.3d 412, 2005-Ohio-5409, 835 N.E.2d 701, ¶ 6. 'This rule stems from the recognition of a balance between tort law,

designed to redress losses suffered by breach of a duty imposed by law to protect societal interests, and contract law, which holds that "parties to a commercial transaction should remain free to govern their own affairs." ' *Id*., quoting *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co*., 42 Ohio St.3d 40, 42, 537 N.E.2d 624 (1989).

*Id*. at ¶ 52.

{¶ 25} "The concern is that if tort remedies were available where the losses suffered were only economic, then private ordering (contract law) would be less effective. If a party could simply avoid its contractual bargain by suing in tort, which often offers more generous terms of recovery, then the effectiveness of contract law would be reduced." *Motorists Mut. Ins. Co. v. Ironics, Inc*., 2022-Ohio-841, ¶ 68.

{¶ 26} Plus argues that the economic-loss rule did not bar its conversion claim because it was an intentional tort. But even in cases involving intentional torts, a mere breach of contract "does not create a tort claim." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co*., 115 Ohio App.3d 137, 151 (9th Dist. 1996). Moreover, the existence of a contract action ordinarily precludes a plaintiff from presenting the same claim as a tort. *Id*. Two requirements must be met before an intentional-tort claim and a contract claim can co-exist. First, an intentional tort "based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Id*.

{¶ 27} Second, the intentional tort must involve damages that are separate and distinct from the breach of contract. *Strategy Group for Media, Inc. v. Lowden*, 2013-Ohio-

1330, ¶ 34 (5th Dist.) (finding no viable fraud claim where "reasonable minds could only conclude that [plaintiff] could not establish a genuine issue of material fact that there was independent duty from that created by the contract and it suffered damages from the fraud in addition to the breach of contract"); *see also Mike Albert, Ltd. v. 540 Auto Repair, Inc.*, 2024 WL 1174425, *14 (S.D. Ohio Mar. 19, 2024) ("To show that an intentional tort has been committed independently, the party must show a breach of an independent duty, as well as damages that are separate and distinct from the breach of contract."); *Highman v. Gulfport Energy Corp.*, 2020 WL 6204344, *4 (S.D. Ohio Oct. 22, 2020) ("Here, Plaintiffs allege that money has been converted due to a breach of the lease agreement. In other words, the property rights alleged to have been converted originate entirely from the rights created under the contract. But a conversion claim cannot be based upon property rights that arise entirely from contractual rights."); *QSI-Fostoria DC, LLC v. Gen. Elec. Capital Business Asset Funding Corp.*, 2007 WL 2460345, *5 (N.D. Ohio Aug. 27, 2007) ("BACM's allegations with respect to its conversion claim mirror its related allegations for breach of contract, and its conversion claim could not exist independently of its claim for breach of contract. In such a situation, BACM's conversion claim cannot survive.").

{¶ 28} Plus reasons that its conversion claim involved an independent duty because parties always have an obligation not to commit intentional torts against one another. If this truism established the requisite independent duty, the exception to the economic-loss rule would swallow the rule. Such a duty not to commit an intentional tort would exist in every case involving intentional torts and contract claims, effectively

rendering the first requirement meaningless. Plus's suggestion that Liberty separately engaged in conversion by *intentionally* failing to turn over accounts receivable "does not change the contractual nature" of Plus's claim. *Textron Fin. Corp.* at 151. Allowing Plus to pursue a conversion claim by affixing the word "intentionally" to an alleged breach of contract would " 'abandon the venerable rule that the motive of a breaching party to a contract is irrelevant' and 'would allow parties to convert contract actions into actions in tort by attacking the motive of the breaching party.' " *Id.*, quoting *Battista v. Lebanon Trotting Assn.*, 538 F.2d 111, 118 (6th Cir. 1976).

{¶ 29} In the present case, we are unpersuaded that any breach by Liberty of duties allegedly resulting in conversion existed separate and apart from the parties' contractual obligations. Plus's conversion claim was grounded in the parties' contracts and the post-closing adjustment process. The central allegation was that Liberty either retained or recouped funds belonging to Plus. Resolution of this issue turned on the parties' contractual duties. Plus also had no damages separate and apart from Liberty's alleged breach of the interim operating agreement and the purchase-and-sale agreement. At trial, Plus's own counsel acknowledged that "if a breach of contract claim is found by the jury . . . the conversion claim would fail" because "[t]hey cannot exist at the same time." Trial Transcript Vol. III at 479. The reason for this concession is obvious—the two claims involved the same contractual obligations and damages.

{¶ 30} For the foregoing reasons, the trial court erred in failing to sustain Liberty's motion for a directed verdict on the conversion claim or, alternatively, its post-trial motion for judgment notwithstanding the verdict. Liberty's second assignment of error is

sustained. The jury's $382,490 conversion verdict will be set aside and the trial court's entry of judgment in Plus's favor on the verdict will be reversed.

## C. Summary Judgment

{¶ 31} In its first assignment of error, Liberty challenges the trial court's entry of summary judgment for Plus in the amount of $280,000 based on a finding that Liberty was not entitled to recoup the negotiated Manager's Contribution reduction.

{¶ 32} The trial court held that an amendment to the purchase-and-sale agreement unambiguously made the $280,000 reduction final with regard to Plus's obligation on the Manager's Contribution. Liberty contends the amendment unambiguously established something else—namely that the $280,000 reduction was to remain payable by Plus post-closing. According to Liberty, the amendment guaranteed more cash in Plus's pocket at closing while imposing on Liberty the risk of recouping the $280,000 after closing by collecting on accounts receivable. In addition to challenging the trial court's entry of summary judgment, Liberty contends the trial court tainted the jury by allowing Plus's counsel to make repeated references to the $280,000 pretrial summary-judgment ruling. Liberty claims it was prejudiced because a confused jury ultimately returned verdicts resulting in multiple $280,000 damage awards.

{¶ 33} Upon review, we agree that the trial court's $280,000 summary-judgment award to Plus was duplicative of damages awarded on the jury's verdicts. As explained above, Plus actually received the same $280,000 three times: first, in the trial court's pretrial summary-judgment ruling; second, as a component of the jury's conversion verdict; and third, as a component of the jury's $540,000 verdict for Liberty's breach of

the interim operating agreement. Our setting aside of the trial court's judgment for Plus on the conversion verdict eliminates one of these redundant recoveries.

{¶ 34} In order to prevent duplicative damages, we likewise will set aside the trial court's entry of summary judgment for Plus in the amount of $280,000 for breach of contract. Regardless of whether the trial court correctly found no ambiguity in the purchase-and-sale agreement's treatment of the $280,000 reduction in the Manager's Contribution, the jury's $540,000 verdict predicated on Liberty's breach of the interim operating agreement necessarily awarded Plus the same damages.

{¶ 35} Given the central role the $280,000 played at trial, and in light of Liberty's repeated challenges to that award on appeal, we cannot uphold a final judgment that awarded Plus the same $280,000 multiple times. We note too that setting aside the trial court's summary-judgment award as duplicative adequately addresses any concerns about references to the $280,000 summary-judgment award tainting the jury.

{¶ 36} Based on our analysis above, the jury properly awarded Plus $540,000 for breach of the interim operating agreement, and that award included the disputed $280,000. Plus was entitled to nothing more. Accordingly, Liberty's first assignment of error is sustained. The trial court's entry of summary judgment will be set aside, and its entry of final judgment in Plus's favor for $280,000 on its summary-judgment decision will be reversed on the grounds that it constituted duplicative damages.

### D. Prejudgment Interest

{¶ 37} Liberty's fourth assignment of error states:

The trial court erred in awarding prejudgment interest to Plus on the amount

of $820,000 beginning on March 31, 2017.

**{¶ 38}** In its final assignment of error, Liberty challenges the trial court's award of prejudgment interest totaling $171,078.79. This award was calculated based on breach-of-contract damages totaling $820,000 (this represented $280,000 for breach of the purchase-and-sale agreement and $540,000 for breach of the interim operating agreement). Liberty contends the prejudgment-interest award was improper because (1) Plus waived its right to such interest by not timely seeking it, (2) the trial court's judgment entry on the jury's verdicts dismissed any claim to prejudgment interest with prejudice, and (3) there was no money "due and payable" by Liberty at closing of the purchase-and-sale agreement upon which to base a prejudgment interest award.

**{¶ 39}** Ohio law provides for recovery of prejudgment interest from the time that money "becomes due and payable" on a contract. R.C. 1343.03(A). Prejudgment interest compensates an aggrieved party for the lapse of time between accrual of a contract claim and entry of a judgment. *Miami Valley Hosp. v. Edwards*, 2008-Ohio-2721, ¶ 14 (2d Dist.). When a plaintiff obtains a judgment on a contract claim, prejudgment interest is mandatory. *Id*. at ¶ 13. A trial court does have discretion, however, to determine when the contract claim accrued, i.e., when the money became "due and payable." *Id*. at ¶ 16. We review that determination for an abuse of discretion. *Id*.

**{¶ 40}** While not disputing the mandatory nature of prejudgment interest, Liberty contends Plus waived its right to such interest "by not timely seeking it." Although Plus mentioned prejudgment interest in its complaint, Plus did not address the issue again prior to the trial court's April 12, 2022 entry of judgment on the jury's verdicts. That entry

included the following language: "Any other claims not submitted to the jury or decided by the Court on summary judgment are dismissed with prejudice." The entry also stated that all claims between the parties had been resolved. Liberty contends the foregoing language precluded the trial court from sustaining Plus's January 12, 2023 motion for prejudgment interest.

{¶ 41} We find Liberty's reliance on the trial court's judgment entry to be unpersuasive. The entry noted that all "claims" had been resolved, while adding that any "claims" not submitted to the jury or decided by the court were dismissed with prejudice. A claim is synonymous with a cause of action. *Weeks v. 203 Main Street, LLC*, 2019-Ohio-2850, ¶ 21, fn. 1 (9th Dist.); *Horner v. Toledo Hosp.*, 94 Ohio App.3d 282, 289, fn. 3 (6th Dist. 1993), citing *Noble v. Colwell*, 44 Ohio St.3d 92, 95 (1989). The prejudgment-interest request in Plus's amended complaint was not a "claim" against Liberty. Plus included the request in its prayer for relief as a statutory remedy, not a separate claim or cause of action. *See, e.g., Longbottom v. Mercy Hosp. Clermont*, 2013-Ohio-4068, ¶ 26 (characterizing prejudgment interest as a "remedy"); *Marion Plaza, Inc. v. D & L Ents., Inc.*, 2010-Ohio-6267, ¶ 15 (7th Dist.) (observing that "awarding prejudgment interest is a remedy designed to wholly compensate"). Therefore, the trial court's observation in its April 12, 2022 judgment entry that all "claims" had been decided or dismissed did not preclude it from later awarding prejudgment interest.

{¶ 42} Even if the trial court's judgment entry did not foreclose prejudgment interest, Liberty contends Plus's January 12, 2023 motion was untimely as it was filed nearly a year after the jury's verdicts. We find this argument to be persuasive. In

*Cotterman v. Cleveland Elec. Illuminating Co.*, 34 Ohio St.3d 48 (1987), the Ohio Supreme Court held that a motion for prejudgment interest on a tort claim was required to be filed within 14 days after the entry of judgment. The *Cotterman* court reached this conclusion by analogizing to then-existing Civ.R. 59(B), which required new-trial motions to be filed no later than 14 days after the entry of judgment. *Id.* at 50.

{¶ 43} In *Chester v. Custom Countertop & Kitchen, Inc.*, 1999 WL 1299301 (11th Dist. Dec. 17, 1999), upon which the trial court relied below, the Eleventh District held that *Cotterman's* rationale for imposing a 14-day time limit to move for prejudgment interest did not apply to a contract claim. *Id.* at *4; *see also Okar v. Farmers Ins. Co. of Columbus, Inc.*, 129 Ohio App.3d 277, 280 (8th Dist. 1998) (holding that *Cotterman* did not apply to prejudgment interest on a contract claim rather than a tort claim). In *Chester*, the Eleventh District instead read a "reasonableness" requirement into R.C. 1343.03(A), which governs contract-based awards of prejudgment interest. Despite the absence of a time requirement in the statute, the Eleventh District held that a motion for prejudgment interest on a contract claim must be filed within a reasonable time.

{¶ 44} Decades after the foregoing cases were decided, Civ.R. 59(B) was amended effective July 1, 2018. The amendment made other types of post-trial motions subject to the same time requirements as the rule previously had imposed on new-trial motions. As amended, Civ.R. 59(B) currently provides: "Except as otherwise provided by statute, a motion for a new trial, remittitur, additur, prejudgment interest, or attorney's fees must be served within twenty-eight days of the entry of judgment or, if the clerk has not completed service of the notice of judgment within the three-day period described in

Civ.R. 58(B), within twenty-eight days of the date when the clerk actually completes service." This court has characterized the 28-day time requirement in Civ.R. 59(B) as being "jurisdictional." *Harrison v. Horizon Women's Healthcare, LLC*, 2019-Ohio-3528, ¶ 12 (2d Dist.).

**{¶ 45}** Significantly, Civ.R. 59(B) identifies a motion for prejudgment interest as a motion that must be served within 28 days of the entry of judgment. Unlike earlier case law, the rule makes no distinction between prejudgment interest on a tort claim or a contract claim. Nor does it impose a nebulous "reasonableness" requirement. To be timely, all motions for prejudgment interest must be served within 28 days of the entry of judgment. Here the trial court entered judgment on the jury's verdicts on April 12, 2022. The clerk served notice of the judgment on the parties the same day. Therefore, Civ.R. 59(B) obligated Plus to serve its motion for prejudgment interest no later than May 10, 2022. Plus did not file and serve its motion until January 12, 2023, eight months beyond the time prescribed the rule.

**{¶ 46}** Although Plus filed its lawsuit against Liberty in September 2017, the amended version of Civ.R. 59(B), which took effect on July 1, 2018, governs "all proceedings in actions brought after [the amendments] take effect *and also all further proceedings in actions then pending, except to the extent that their application in a particular action pending when the amendments take effect would not be feasible or would work injustice*, in which event the former procedure applies." Civ.R. 86(RR) (Emphasis added.) We see no reason why applying Civ.R. 59(B)'s time requirement to Plus's January 12, 2023 motion for prejudgment interest would not be feasible or would

work an injustice.

{¶ 47} Prejudgment interest may be non-discretionary when requested, but Civ.R. 59(B) states that a party must timely seek it. For the reasons set forth above, the trial court erred in rejecting Liberty's argument that Plus had been required to move for prejudgment interest within 28 days of the April 12, 2022 judgment entry on the jury's verdicts. Liberty's fourth assignment of error is sustained.

### III. Plus's Cross-Appeal

{¶ 48} Plus advances two assignments of error in its cross appeal. Both address the trial court's entry of a directed verdict for Liberty and Black-Kurek on punitive damages. The first assignment of error states:

> The trial court erred by granting Liberty Health Care Corporation and Linda
>
> Black-Kurek's motion for a directed verdict as to punitive damages on Plus
>
> Management's conversion claim.

{¶ 49} The trial court directed a verdict for Liberty and Black-Kurek on Plus's claim for punitive damages predicated on conversion. The trial court found no evidence of malice to support punitive damages, reasoning: "[T]he circumstances of this case indicate conflicting interpretations of the contract and the language. However, these differing interpretations and the actions subsequently taken as a result of such interpretations do not rise to the level of actual malice or ill will." Trial Transcript Vol. III at 686.

{¶ 50} A tort plaintiff may not obtain punitive damages unless (1) the act or omissions of the defendant demonstrated malice or aggravated or egregious fraud, and (2) the trier of fact awarded the plaintiff compensatory damages. *Massie v. White*, 2019-

Ohio-811, ¶ 26 (2d Dist.). "The burden of proof rests with the plaintiff to establish entitlement to punitive damages by clear and convincing evidence." *Id.* We review the trial court's entry of a directed verdict de novo. *Harrod v. USAA Ins. Co.*, 2019-Ohio-2748, ¶ 13 (2d Dist.).

**{¶ 51}** Given our determination above that Plus had no viable conversion claim, the trial court's entry of a directed verdict on the issue of punitive damages could not have been prejudicial error. When addressing punitive damages for conversion, the trial court itself observed that the parties' dispute involved "conflicting interpretations of the contract." As explained above, Liberty's failure to turn over accounts receivable to Plus could have constituted at most a breach of contract, not conversion. But even assuming arguendo that a valid conversion claim existed, we would find no error in the trial court's directed verdict. We agree with the trial court that the parties' conflicting contractual interpretations did not evidence malice on the part of Liberty or Black-Kurek. Accordingly, Plus's first assignment of error is overruled.

**{¶ 52}** Plus's second assignment of error states:

The trial court erred by granting Liberty Health Care Corporation and Linda Black-Kurek's motion for a directed verdict as to punitive damages on Plus Management's fraud claim.

**{¶ 53}** The trial court also directed a verdict for Liberty and Black-Kurek on Plus's punitive-damages claim predicated on fraud. The trial court reasoned that the jury's award of $10.00 nominal damages for the fraud claim did not support awarding punitive damages. Trial Transcript Vol. III at 687.

{¶ 54} On appeal, Plus contends punitive damages are available where fraud is "aggravated or egregious" due to malice. In the present case, however, we see no evidence of malice. Plus claims Liberty "stole" the disputed $280,000 post-closing by recouping the money from accounts receivable. But Liberty's actions were based on a dispute over the meaning of contractual language. We see no aggravated or egregious fraud predicated on malice. Regardless, the trial court correctly recognized that nominal damages could not support a punitive-damages award. Actual compensatory damages were needed. *Gevedon v. Gevedon*, 2006-Ohio-2668, ¶ 29 (2d Dist.) (recognizing "that punitive damages are not recoverable in a tort action unless the plaintiff has adduced proof of actual damages that resulted from the tortious conduct"). Accordingly, Plus's second assignment of error is overruled.

## IV. Conclusion

{¶ 55} Having sustained Liberty's first and second assignments of error, we reverse the trial court's April 12, 2022 final judgment entry to the extent that it entered judgment for Plus in the amount of $382,490 for conversion and in the amount of $280,000 based on its summary-judgment decision.

{¶ 56} Having sustained Liberty's fourth assignment of error, we also reverse the trial court's June 20, 2023 decision, order, and entry to the extent that it awarded Plus prejudgment interest.

{¶ 57} The trial court's entry of a directed verdict for Liberty and Black-Kurek on Plus's request for punitive damages is affirmed.

{¶ 58} The above-captioned case is remanded to the trial court for the preparation

and filing of a new final judgment entry consistent with this opinion.

. . . . . . . . . . . . .


EPLEY, P.J. and HUFFMAN, J., concur.